**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

RYLAN MASTERSON and NICHOLAS
AVAKYAN, individually and on behalf of all
others similarly situated,

    Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, CANISIUS UNIVERSITY,
NIAGARA UNIVERSITY, ROCHESTER
INSTITUTE OF TECHNOLOGY, BOSTON
COLLEGE, BOSTON UNIVERSITY,
UNIVERSITY OF DENVER, QUINNIPIAC
UNIVERSITY, UNIVERSITY OF NOTRE
DAME DU LAC, STONEHILL COLLEGE,
and UNIVERSITY OF ST. THOMAS,

    Defendants.

No. 1:24-cv-00754

**JURY TRIAL DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Rylan Masterson is a resident and citizen of Fort Erie, Ontario. In 2022, when he was sixteen years old, he played two exhibition games for the Windsor Spitfires of the Canadian Hockey League ("CHL") and, as a result of the illegal conspiracy in violation of the U.S. antitrust laws alleged herein, lost his eligibility to play Division I hockey for any institution that is a member of the National Collegiate Athletic Association ("NCAA").

Plaintiff Nicholas Avakyan is a resident and citizen of California. Starting when he was sixteen, he played three years for CHL teams in Washington and Oregon, where he received a stipend of approximately $100 per week for living expenses. He wants to play NCAA Division I

hockey next year, but, as a result of the same illegal conspiracy that has prevented Rylan from playing NCAA Division I hockey, he is also prohibited from doing so.

Plaintiffs, individually and on behalf of a class of hockey players (defined below), bring this action against the NCAA, Canisius University, Niagara University, Rochester Institute of Technology, Boston College, Boston University, University of Denver, Quinnipiac University, University of Notre Dame du Lac, Stonehill College, and University of St. Thomas (collectively, the "University Defendants," and together with NCAA, "Defendants"), and alleges as follows:

## I.    <u>INTRODUCTION</u>

1.    The NCAA is an unincorporated association of colleges and universities that compete with each for, among other things, top young athletes. These member institutions agree to adopt and be bound by certain rules, which they promulgate through the NCAA.

2.    This action arises out of the NCAA rule—agreed to and enforced by all of the NCAA's member institutions, including the University Defendants—that, in violation of Section 1 of the Sherman Act, prohibits anyone who has ever played in the CHL from playing NCAA Division I hockey.

3.    For the best young ice hockey players in North America, there are two primary routes to a lucrative, professional hockey career in the National Hockey League ("NHL").

4.    The first option is playing Division I hockey at the college level in the United States, where student-athletes typically receive full-ride scholarships for their significant role in generating more than $150 million each year for their colleges and universities.

5.    The second option is the CHL, a 20-and-under junior league with teams in the United States and Canada that for decades has served as the biggest and most reliable supplier of NHL talent.

6.     In a perfectly competitive market, top-end hockey players could and would move between these leagues (Division I and the CHL) as their age, career goals, and circumstances change.

7.     The NCAA member institutions, however, have entered into a horizontal agreement that prevents that result—the NCAA's bylaws prohibit any player who has played a CHL game, even a preseason game, from playing Division I hockey.

8.     This scheme (referred to herein as the "Boycott") prevents competition between the CHL and NCAA for top-end players and thus artificially suppresses compensation for players and artificially creates less competitive leagues. Not only that, the Boycott also puts sixteen-year-olds in the impossible position of deciding, at that young age, whether they will ever want to play Division I hockey. It is *per se* illegal under the antitrust laws, including because it constitutes a group boycott.

9.     Accordingly, on behalf of the proposed class of anyone who either (i) played in the CHL at any point between August 12, 2020, and the present, or (ii) attended college at any point between August 12, 2020, and the present after playing in the CHL, Plaintiffs bring this action under Section 1 of the Sherman Act to enjoin the Boycott and to remedy the harm it has caused, including through money damages, trebled under the antitrust laws.

## II.     PARTIES

### a.  Plaintiffs

10.     Plaintiff Rylan Masterson is a resident and citizen of Fort Erie, Ontario. In 2022, when he was sixteen years old, he played two exhibition games for the CHL's Windsor Spitfires and thus lost his eligibility to play Division I hockey.

11.     Mr. Masterson is a high school graduate. He is ready, able, and willing to play NCAA Division I hockey, including for the University Defendants' Division I teams, and particularly in this district, which is close to his home in Fort Erie, Ontario.

12.     Plaintiff Nicholas Avakyan is a resident and citizen of California. Beginning in the 2021-22 season, when he was sixteen, Mr. Avakyan played in the CHL. He played for the Tri-City Americans in Kennewick, Washington, during the 2021-22 and 2022-23 seasons, and split the 2023-24 season between the Americans and the Portland Winterhawks in Portland, Oregon.

13.     During his first two seasons, Mr. Avakyan received a stipend of $175 every other week. He spent approximately 35 hours per week on team-required work those seasons. In his third season, Mr. Avakyan received a stipend of $200 every other week and spent approximately 63 hours per week on team-required work.

14.     Mr. Avakyan is a high school graduate and is ready, willing, and able to play NCAA Division I hockey next year. Experts in the field have affirmed that he is a good enough player to do so. Mr. Avakyan will not be eligible to play in the CHL next year because he will be too old.

**b. Defendants**

15.     Defendant NCAA is an unincorporated association that acts as the governing body of college sports. Its national office is located at 700 W. Washington Street, P.O. Box 6222, Indianapolis, Indiana 46206.

16.     The NCAA has approximately 1,100 member schools located in all 50 states, the District of Columbia, Puerto Rico, and Canada. These member schools compete in three different divisions—Division I, II, and III—in dozens of sports, including men's ice hockey.

17.     The NCAA is self-governing, meaning that it is governed by its member institutions. Those institutions, including the University Defendants, have adopted rules for

institutions participating in Division I sports, as well as consequences for violations of those rules. This set of rules and consequences, which includes the Boycott, is referred to herein as the NCAA's "bylaws."

18.     Defendant Canisius University, formerly known as Canisius College, is a private university located in Buffalo, New York, that has agreed to the Boycott. Canisius University has a Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Canisius University does not permit current or former CHL players to play for its Division I team.

19.     Defendant Niagara University is a private university located in Lewiston, New York, that has agreed to the Boycott. Niagara University has a Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Niagara University does not permit current or former CHL players to play for its Division I team.

20.     Defendant Rochester Institute of Technology is a private research university located in Rochester, New York, that has agreed to the Boycott. Rochester Institute of Technology has a Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Rochester Institute of Technology does not permit current or former CHL players to play for its Division I team.

21.     Defendant Boston College is a private research university located in Chestnut Hill, Massachusetts, that has agreed to the Boycott. Boston College has a Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Boston College does not permit current or former CHL players to play for its Division I team.

22.     Defendant Boston University is a private research university located in Boston, Massachusetts, that has agreed to the Boycott. Boston University has a Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Boston University does not permit current or former CHL players to play for its Division I team.

23.     Defendant University of Denver is a private research university located in Denver, Colorado, that has agreed to the Boycott. University of Denver has a Division I men's ice hockey team is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, University of Denver does not permit current or former CHL players to play for its Division I team.

24.     Defendant Quinnipiac University is a private research university located in Hamden, Connecticut, that has agreed to the Boycott. Quinnipiac University has an NCAA Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Quinnipiac University does not permit current or former CHL players to play for its Division I team.

25.     Defendant University of Notre Dame du Lac is a private research university located in Notre Dame, Indiana, that has agreed to the Boycott. University of Notre Dame du Lac has an NCAA Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, University of Notre Dame du Lac does not permit current or former CHL players to play for its Division I team.

26.     Defendant Stonehill College is a college located in Easton, Massachusetts, that has agreed to the Boycott. Stonehill College has an NCAA Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, Stonehill College does not permit current or former CHL players to play for its Division I team.

27.     Defendant University of St. Thomas is a private research university located in Minneapolis, Minnesota, that has agreed to the Boycott. University of St. Thomas has an NCAA Division I men's ice hockey team and is thus an NCAA member institution bound by the NCAA's bylaws. Pursuant to the Boycott, University of St. Thomas does not permit current or former CHL players to play for its Division I team.

### c.  Relevant Non-Parties

28.     The NHL is an unincorporated joint venture association that operates a professional hockey league comprising thirty-two member teams in the United States and Canada. The NHL's principal place of business is 1185 Avenue of the Americas, New York, New York 10036.

29.     The CHL is an incorporated not-for-profit organization that is organized under the laws of Canada. The CHL's principal place of business is 5255 Yonge Street, Suite 905, North York, Ontario M2N 6PK.

30.     The CHL comprises the Western Hockey League ("WHL"), the Ontario Hockey League ("OHL"), and the Quebec Maritimes Junior Hockey League ("QMJHL").

31.     The WHL is a corporation incorporated under the laws of Canada. The WHL's principal place of business is 2424 University Drive N.W., Calgary, Alberta T2N 369. Twenty-two teams—located in British Columbia, Alberta, Saskatchewan, Manitoba, Washington, and Oregon—compete in the WHL.

32.     The WHL draws players from at least Alberta, British Columbia, Manitoba, Saskatchewan, Northwest Territories, Yukon, Alaska, Arizona, California, Colorado, Hawaii,

Idaho, Kansas, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming.

33. The OHL is a corporation incorporated under the laws of Canada. The OHL's principal place of business is 305 Milner Avenue, Suite 200, Scarborough, Ontario M1B 3V4. Twenty teams—located in Ontario, Michigan, and Pennsylvania—compete in the OHL.

34. The OHL draws players from at least Ontario, Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin.

35. The QMJHL is a corporation incorporated under the laws of Canada. The QMJHL's principal place of business is 101-1205 rue Ampere, Boucherville, Quebec J4B 7M6. Eighteen teams—located in Quebec, New Brunswick, Nova Scotia, and Prince Edward Island—compete in the QMJHL.

36. The QMJHL draws players from at least Quebec, New Brunswick, Prince Edward Island, Nova Scotia, Newfoundland, Maine, Massachusetts, Vermont, Rhode Island, New Hampshire, and Connecticut.

## III.   JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because over $5 million, exclusive of interests and costs, is in controversy and because a member of the proposed class is a citizen of a state different from the defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

38. This Court has personal jurisdiction over Canisius University, Niagara University, and Rochester Institute of Technology, because they are each located in this district.

39.     This Court has personal jurisdiction over the remaining Defendants, including pursuant to CPLR 302(a)(2), because this action arises out of and relates to their tortious conduct in this district.

40.     *First*, pursuant to the Boycott, Plaintiffs were precluded from playing for any NCAA Division I team located in this district—the district closest to Mr. Masterson's residence in Fort Erie, Ontario. Plaintiffs were likewise precluded from playing for any NCAA Division I team that competes in this district, and from participating in events like the NCAA national men's ice hockey tournament, which was held in Buffalo, New York in 2019.

41.     *Second*, Defendants enforce the Boycott in this district. Pursuant to the Boycott and the NCAA's bylaws, Canisius University, Niagara University, and Rochester Institute of Technology are each prohibited by the other Defendants from permitting current and former CHL players, including Plaintiffs, from playing for their Division I team. Under the Defendants' agreement, as memorialized in the NCAA's bylaws, these schools (like any other NCAA member institution) could face significant consequences and penalties for violating the Boycott.

42.     *Third*, Defendants apply the Boycott to prospective players who reside in this district. Indeed, although the University Defendants actively recruit players for their Division I teams from this district (as evidenced by the number of players from this district who play for the University Defendants' and other NCAA Division I men's ice hockey teams), they refuse to recruit current or former CHL players who reside in this district, even though their teams would benefit substantially from the services of such players.

43.     *Fourth*, this action arises out of a conspiracy between and among Defendants and the NCAA's other member institutions—*i.e.*, the Boycott—and Defendants' co-conspirators have engaged in overt acts in this district in furtherance of this conspiracy. For example, as noted above,

Canisius University, Niagara University, and Rochester Institute of Technology enforce the Boycott in this district by, among other things, refusing to recruit or allow current or former CHL players, including Plaintiffs, to play for their NCAA Division I teams. Further, on information and belief, Canisius University, Niagara University, and Rochester Institute of Technology have engaged in communications in and from this district concerning and in furtherance of the Boycott, both internally and with other co-conspirators.

44.     For all of the reasons referenced above, it would not offend due process for this Court to exercise jurisdiction over Defendants. Underscoring that point, Defendants generate substantial revenues in this district, including from ticket, merchandise, and concession sales, and from television contracts. Indeed, the NCAA holds dozens of competitions in men's ice hockey in this district each year, and many more in other sports, including the first two rounds of the popular March Madness basketball tournament in 2022. In addition, Defendants market their schools and products, including their men's ice hockey teams, in this district, and students and their families in this district pay substantial amounts of tuition to the University Defendants each year.

45.     Venue lies within this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found or had agents in this district, and a substantial portion of the alleged activity affected interstate trade and commerce in this district.

46.     Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because, as explained above, Defendants are subject to personal jurisdiction here.

IV.     **FACTUAL ALLEGATIONS**

      **a. Industry Background**

47.     For many young ice hockey players, the ultimate goal is to play in the NHL, which is almost universally regarded by industry experts, publications, and fans as the most competitive

men's ice hockey league in the world. The NHL's "farm" league—the American Hockey League ("AHL") (collectively with the NHL, the "NHL Leagues")—also offers players with opportunities, albeit less lucrative and with less fanfare, to make a living from playing hockey.

48.     CHL and Division I teams are the primary feeders into the NHL, where players typically make millions of dollars annually. Accordingly, playing in the CHL or Division I provides players with the best shot at making a career of playing hockey.

49.     More than sixty teams compete in Division I men's ice hockey across the United States. Players range in age from 17 to 26.

50.     Under current NCAA rules, these teams may each award the equivalent of eighteen full-ride scholarships per year. On information and belief, most teams spend to this limit.

51.     Approximately 30 percent of current NHL players played Division I hockey.

52.     Players in the CHL range in age from sixteen to twenty, although exceptions are occasionally granted to younger players who are deemed exceptional.

53.     The CHL is the largest supplier of talent to the NHL. For the 2022-2023 season, for example, more than 50 percent of NHL players had played in the CHL; and CHL players accounted for more than one-third of all selections in the 2022 NHL Entry Draft.

54.     CHL players come from all over the world, but approximately 65 percent are from Canada and approximately 30 percent are from the United States.

55.     Many CHL players subsequently pursue college degrees. In 2022, nearly 1,000 former CHL players were attending college while also participating in varsity athletics.

56.     CHL players do not receive a salary; instead, they receive a stipend of no more than $600 per month. The stipend is intended to cover living expenses. For tax purposes, the stipend is characterized as an expense allowance, not income.

57.     Both leagues have a high concentration of NHL-caliber players. For the 2023-2024 season, for example, approximately 230 players in Division I had been selected in an NHL draft. Similarly, NHL teams draft approximately 80 players from the CHL each year, representing approximately one-third of all players selected across the world.

58.     Players, coaches, scouts, and the leagues themselves recognize that the CHL and Division I are the principal options for the best young players. Numerous articles discuss the merits of each league, including academic literature that examines how players decide whether to play in the CHL or NCAA. There is even a nonprofit—College Hockey Inc.—dedicated to helping "any young player and their family deciding whether to pursue" the NCAA or CHL.

59.     As College Hockey Inc. explains: "Talented [] hockey players face a choice at a young age as to where to pursue their dreams – two paths that can both lead to the NHL, but have a number of differences between them. On one hand is college hockey, more specifically the 60 teams that make up NCAA Division I. On the other is major junior, or the 60 teams in the OHL, QMJHL and WHL that make up the Canadian Hockey League (CHL)."

60.     Consistent with that "two paths" understanding, the NCAA and CHL are, according to industry experts, "fierce rivals" and have been "[f]or decades."

61.     The NCAA's recruiting rules are tailored to permit Division I teams to compete with CHL teams for young players. For example, under the NCAA's default rule, schools cannot contact a prospective player "before June 15 at the conclusion of the individual's sophomore year in high school." (Bylaw 13.1.3.1.) But to account for the fact that players may play in the CHL when they are sixteen years old, the NCAA adopted a bylaw that, as a special exception applicable to men's ice hockey, permits Division I teams to recruit players "beginning January 1" of their "sophomore year in high school." (Bylaw 13.1.3.1.5.)

62.     Aside from the CHL and Division I, there are other leagues where talented young players may hone their skills, including the United States Hockey League ("USHL"), Canadian Junior A hockey (which includes both the BCHL and AJHL), and Canadian college hockey. As explained further below, from the perspective of players, these other leagues are not reasonable substitutes to the CHL and Division I of the NCAA.

63.     The USHL is an unincorporated association comprising sixteen member teams in the United States. Players in the USHL range in age from sixteen to twenty-one. USHL players, like CHL players, do not receive a salary. The teams cover their players' meal and living expenses.

64.     The quality of play in the USHL is consistently regarded as lower than in the CHL, and far fewer players from the USHL than CHL are drafted by NHL teams each year. And of those players who are drafted, the vast majority leave the USHL to play Division I hockey as soon as they are eligible.

65.     Accordingly, the USHL is better (and often) described as a feeder to Division I hockey, rather than a competitor to the CHL. Indeed, the USHL publishes a list on its website showing which players have committed to play Division I hockey, and data from College Hockey Inc. indicates that the USHL produces more Division I hockey players than any other league.

66.     In further contrast to both the CHL and Division I, players rarely jump directly from the USHL to the NHL Leagues.

67.     Canadian Junior A hockey is similar in each of these respects to the USHL. For example, the quality of play is regarded as lower than both Division I and the CHL, relatively few players from Canadian Junior A teams are drafted by NHL teams, many Canadian Junior A players subsequently play Division I hockey, and very few Canadian Junior A players jump directly from Canadian Junior A to the NHL Leagues.

68. Canadian college hockey—sometimes called "U Sports"—is also not of the same quality as CHL or Division I hockey. Few NHL players are drafted from "U Sports" teams and few make the NHL Leagues. In addition, compared to Division I hockey, athletic scholarships in "U Sports" are far more restrictive, both in amount (they do not cover all living expenses) and with respect to conditions (they are available only for students who satisfied stringent academic requirements in high school).

### b. The Relevant Labor Market

69. The relevant labor market in this action is the market for the services of elite young male hockey players, defined as those between the ages of sixteen and twenty-two who have sufficient skill to play in the most competitive non-NHL Leagues in North America (the "Elite Young Player Services Market"). In this market, high-end ice hockey players supply their labor to teams, which profit from that labor in the form of ticket, merchandise, and other sales. Those teams, in turn, compete for that labor, with the understanding that better players lead to higher ticket sales and more revenue.

70. From the perspective of the players in the Elite Young Player Services Market, the only buyers of their labor are teams in the CHL and Division I institutions. Indeed, as explained above, CHL and Division I teams offer players the best chance at playing in the NHL and the highest level of play in North America among non-NHL Leagues.

71. Other alternatives—like teams in the USHL, Canadian Junior A hockey, and Canadian college hockey—are not, on their own, regarded by players as reasonable substitutes for Division I and CHL teams. Among other reasons, those alternatives do not offer players similar chances to play in the NHL or a similarly high level of play.

72.     Underscoring that USHL teams are not buyers in the Elite Young Player Services Market, the Boycott imposed by Defendants targets the CHL and its teams, but not the USHL and its teams, even though there is no principled basis to characterize the CHL but not the USHL as a "professional" league.

73.     Nevertheless, as a result of Defendants' conduct, players in the Elite Young Player Services Market that wish to preserve their right to play NCAA Division I hockey are often forced to play for teams in the USHL (or Canadian Junior A) when they are sixteen and seventeen, instead of being permitted to play for teams in the CHL.

74.     Players in the Elite Young Player Services Market also do not regard teams in the NHL Leagues as reasonable substitutes for CHL or Division I teams because such players are generally not yet qualified to join the NHL Leagues, which are dominated by older, stronger, and more experienced players. In addition, pursuant to an agreement between the CHL and NHL, most CHL players are not eligible to play in the AHL.

75.     In short, a hypothetical monopsonist in the Elite Young Player Services Market could profitably suppress wages below competitive levels because an insufficient number of high-end players would choose to sell their labor to teams in the USHL, Canadian Junior A, Canadian college hockey, or other leagues in response. Put differently, the cross-elasticity of supply for players in the Elite Young Player Services Market between CHL and Division I teams on one hand, and teams in other leagues on the other hand, is not sufficiently high to constrain Division I and CHL teams from profitably suppressing wages.

   **c.   The Relevant Geographic Market**

76.     The relevant geographic market is North America. High-end players from North America typically do not view teams in other parts of the world—like Sweden, Finland, Russia, Switzerland, or Austria—as reasonable alternatives.

77.     Confirming this fact, European professional and junior hockey leagues have very few, if any, North American players that are between sixteen and twenty-two years old. The same is true with respect to leagues located in other parts of the world.

78.     Players in the Elite Young Player Services Market are, however, willing to play far from home, so long as they are still playing in North America. For example, Boston University's Division I team includes players from New York, Michigan, Pennsylvania, Ontario, Newfoundland, Minnesota, California, Illinois, New Jersey, British Columbia, Georgia, Quebec, and Colorado. And the University of Denver has more players from Alberta (six) than Colorado (three)—and nearly as many players from Canada as from the United States.

79.     Similarly, in the CHL, players are selected in a draft and may be traded. Accordingly, these players have no say in whether they will play anywhere near their hometowns. This is especially stark in the case of the WHL, where teams span from Victoria, British Columbia, to Winnipeg, Manitoba—a 26-hour car ride across two time zones.

**d.  Teams in the Elite Young Player Services Market are Engaged in Commercial Activity**

80.     Teams in the CHL and Division I profit substantially from the services of players in the Elite Young Player Services Market.

81.     Although profitability varies by team, some CHL teams earn millions of dollars in annual profits and are worth more than $50 million. As of 2016, revenue for each team in the OHL and WHL exceeded $1 million. On average, CHL coaches make more than $100,000.

82.     Similarly, Division I hockey teams often earn millions of dollars in revenue. In 2016, for example, Boston University earned nearly $9 million in revenue—$329,527 per player. Division I teams collectively earned more than $160 million in revenue in 2016. Consistent with this, coaches earn hundreds of thousands of dollars in annual salaries; indeed, in Maine, the highest-paid state employee is Ben Barr, the University of Maine's hockey coach, who will earn $425,000 in 2024.

83.     As compensation for the value that they provide, among other benefits, Division I hockey players receive full-ride scholarships, worth hundreds of thousands of dollars, as well as the right to earn royalties on their name, image, and likeness used by commercial entities like video game developers. They may also receive other benefits, including NIL payments.

### e.  The NCAA and Its Teams Have Market Power

84.     The NCAA and its teams have market power in the Elite Young Player Services Market for two primary reasons.

85.     First, the market is highly concentrated. Players are forced to choose between two leagues, the NCAA and CHL. And with respect to the CHL, players have no ability to choose which team they play for.

86.     Second, the NCAA's teams collectively have a high market share. Those teams buy approximately 50 percent of labor in that market and operate as a cartel.

87.     Underscoring the market power of the NCAA and its teams, Division I teams have agreed to unreasonable limits on player compensations, including a "cap" of eighteen full-ride scholarships per team. Division I teams would not be able to impose these compensation restrictions, which are below the competitive level, if they did not have market power.

88.     This market power is protected by significant entry barriers. Players in the Elite Young Player Services Market provide labor to CHL and Division I teams because those leagues have established, over a long period of time, a track record for producing successful NHL players; offer high levels of play; are widely watched and followed by NHL scouts; and are dominant in the corresponding product market. A new league would lack that track record and would not be able to effectively compete in the relevant market; indeed, the CHL and Division I have served as the primary springboards for the NHL Leagues for decades, and over that period, no legitimate competitor has entered the market or otherwise emerged. Similarly, it would be prohibitively expensive for such a league to attract a sufficient number of talented players to match the CHL and Division I's high level of play and to establish the same degree of popularity and name recognition in the corresponding product market or among NHL scouts.

89.     Further, existing Division I teams are not significantly constrained by the possibility of new Division I teams entering the market because any new teams would be subject to the NCAA's bylaws regarding compensation, as well as the Boycott.

90.     Nor are NCAA and its Division I teams significantly constrained by the possibility of new CHL teams entering the market: the CHL has a draft that essentially precludes CHL teams from competing with each other for players.

### f.   The NCAA Boycotts CHL Players

91.     The NCAA and its membership institutions have agreed, through certain bylaws, to prohibit anyone who has played in the CHL from playing Division I hockey (the "Boycott").

92.     NCAA Bylaw 12.2.3.2 states: "An individual shall not be eligible for intercollegiate athletics in a sport if the individual ever competed on a professional team."

93. NCAA Bylaw 12.2.3.2.1 states in relevant part: "In sports *other than men's ice hockey* and skiing, before initial full-time collegiate enrollment, an individual may compete on a professional team . . . ." (emphasis added).

94. NCAA Bylaw 12.2.3.2.3 states: "Ice hockey teams in the United States and Canada, classified by the Canadian Hockey Association as major junior teams, are considered professional teams under NCAA legislation."

95. Collectively, these provisions make up the Boycott. The impact and consequences of the Boycott are well-understood. As explained by one industry publication: "Whether a player dresses in 200 CHL games or one pre-season game, they lose their eligibility for NCAA hockey."

### g. The NCAA's Boycott Harms CHL Teams and Players and Cannot Reasonably Be Justified on Amateurism Grounds

96. The purpose of the Boycott is to harm Division I's primary competitor, the CHL, by reducing its ability to recruit players in the Elite Young Player Services Market. It is not intended to promote or protect amateurism, if that is even a cognizable goal under the antitrust laws.

97. Indeed, as explained below, recent reporting has revealed that the primary reason that the NCAA and its member institutions have maintained the Boycott rule is that they believe that it effectively deters high-end players from joining the CHL. Put differently, the NCAA and its member institutions have continued the Boycott not because they want to promote amateurism, but because they reasonably believe that the Boycott results in Division I teams attracting and obtaining the services of players who would otherwise play in the CHL.

98. This understanding accords with common sense. On its face, the Boycott makes the CHL less attractive to players because it transforms a player's decision to join the CHL into a decision to join the CHL *and* forever forego the opportunity to play in Division I. Division I

benefits from this dynamic because it creates a positive feedback loop, where relatively more players in the Elite Young Player Services Market choose to play for Division I teams instead of CHL teams, which makes Division I more attractive to players in the Elite Young Player Services Market and fans in the corresponding product market, which causes even more players to join Division I teams instead of CHL teams.

99.    In early 2023, the NCAA conducted a review of its bylaws to identify "legal vulnerabilities." One such "vulnerability" that "stood out" to the NCAA—not just with respect to men's ice hockey, but with respect to all sports—was the Boycott.

100.    Later that year, notwithstanding the NCAA's awareness of the Boycott's dubious status under the law, NCAA officials told Division I coaches (who are employed by the NCAA member institutions, including the University Defendants) that they *could*, but would not be required to, eliminate the Boycott if they chose. The NCAA conveyed, in substance, that the issue was in the coaches' hands. In order for the NCAA to end the Boycott, however, enough coaches needed to vote in favor of eliminating it.

101.    The coaches, especially those of Division I's most successful programs, have refused to do so. This is because they believe (i) that the Boycott helps prevent the highest-caliber players (*i.e.*, those that draw fans and attract other top-end recruits) from choosing to play in the CHL instead of Division I; (ii) that Division I has "won the war" with the CHL as a result of the Boycott; (iii) that it "doesn't make sense" to go back now; and (iv) that "the current setup is advantageous to them."

102.    Some minority of coaches, however (primarily those of less competitive Division I teams), have indicated that they would support eliminating the Boycott. They believe that their teams would benefit if the pool of potential players were expanded to include current and former

CHL players. But notwithstanding their opposition to the Boycott, these coaches and their Division I teams continue to adhere to it, presumably because they would face sanctions under the NCAA's bylaws if they violated it.

103.     In early May 2024, NCAA coaches held their annual meeting in Naples, Florida, where they discussed, among other issues, whether they would retain the Boycott. The coaches did not vote on that issue, though. Instead, recognizing that the Boycott was on shaky legal ground, they reportedly "formed a committee to monitor legal challenges to the rule" and "keep discussions alive about how college hockey would best react to a change if it was forced by the court."

104.     The foregoing makes clear that the Boycott has nothing to do with promoting or protecting amateurism; instead, it is a commercial rule with the commercial purpose of harming the NCAA's chief competitor for talent, the CHL.

105.     To the extent that the NCAA nevertheless relies on an amateurism justification, that argument should be rejected for several additional reasons, including those set forth below.

106.     First, the NCAA generally allows athletes who had previously competed in professional leagues to participate in Division I sports. The *only exception* that is enforced across all NCAA collegiate sports is for CHL players, who are barred on the purported grounds that they are "professional" athletes. Yet individuals who played professional hockey in other countries are permitted to play Division I hockey. For example, Tom Willander played professional hockey in Sweden and now plays hockey for Boston University's Division I team. The same is true with respect to Oskar Jellvik (Boston College), Simon Jellus (University of Vermont), and Viktor Hurtig (Michigan Tech).

107.     Second, the NCAA permits women's ice hockey players who have played in the CHL to subsequently play NCAA Division I women's ice hockey. For example, Eve Gascon

played two games for the Gatineau Olympiques of the QMJHL during the 2021-22 season and now plays for University of Minnesota-Duluth's NCAA Division I women's ice hockey team.

108.    Third, the NCAA allows athletes who compete in other sports to receive significant compensation without losing their NCAA eligibility. Tennis players, for example, may make $10,000 "per calendar year"—far more than CHL players are paid. Other athletes—like swimmers Katie Ledecky and Joseph Schooling—received six-figure payments ($115,000 and $740,000, respectively) for their athletic performances, yet retained their eligibility.

109.    Fourth, the notion that CHL players are "professional" athletes who should be barred from Division I hockey is unreasonable. CHL players, as noted above, receive minimal stipends for living expenses—far below minimum wage. The stipends that they receive are comparable to what USHL players receive. And USHL players, of course, are permitted to play Division I hockey (indeed, the USHL supplies Division I teams with many players each year), as NCAA Bylaw 12.2.3.2.3 does not apply to them (or at least has not been interpreted to apply to them).

110.    Fifth, payments that CHL players receive are far less than Division I players receive. Indeed, full-ride scholarships are valuable—worth hundreds of thousands of dollars—and cover living expenses. In fact, the NCAA recently asserted that benefits for Division I athletes "include, but are not limited to, instruction and training under first-class coaches at first-class athletic facilities, medical care, travel, and athletic equipment, opportunities to compete at a high-level, scholarships and financial support amounting to hundreds of thousands of dollars, a cash stipend of up to $5,980 per academic year, and additional academic support such as increased tutoring and mentoring." On top of that, Division I athletes may make millions of dollars through

NIL deals, including deals that are structured to induce them to commit to a particular school. If CHL players are "professional" athletes, Division I players are as well.

111.     Sixth, the revenues that Division I teams earn are comparable to those that CHL teams earn. If the CHL is a "professional" sports league, then the NCAA is as well.

112.     Seventh, as part of a recent proposed settlement in the *House* litigation,[1] the NCAA has agreed to permit member institutions to share future revenue with athletes. Under the proposed plan, Division I schools will be permitted to distribute, on top of existing benefits, up to 22 percent of the average Power Five school's revenue to their athletes. Analysts estimate that the *House* settlement, if approved, would permit each Division I school to provide an additional $20 million to $23 million annually to athletes.

### h.     The NCAA's Boycott Produces Anticompetitive Effects in the Labor Market

113.     The Boycott harms competition in the Elite Young Player Services Market in several ways, and has caused, and continues to cause, anticompetitive effects in that market.

114.     First, the Boycott reduces competition among Division I teams for players in the Elite Young Player Services Market. Specifically, the Boycott constitutes an agreement between those teams to not compete for current and former CHL players.

115.     Second, the Boycott prevents competition on the merits between the CHL and NCAA. It precludes competition between Division I teams and CHL teams for players who have played in the CHL. And it further suppresses competition between the CHL and NCAA by artificially decreasing the benefits of playing in the CHL.

---

[1] *See* Stipulation and Settlement Agreement, *In re College Athlete NIL Litig.*, No. 4:20-cv-03919 (N.D. Cal. July 26, 2024), Dkt. No. 450-3.

116. The Boycott thus causes lower wages, lower output, and a lower-quality playing experience (thus reducing players' chances of having successful playing careers), in the Elite Young Player Services Market.

117. <u>Lower wages for players</u>. The Boycott leads to lower wages for players in the Elite Young Player Services Market on a market wide basis. Absent the Boycott, Division I teams would compete to lure players away from the CHL, and CHL teams would likewise compete to prevent those players from moving to the NCAA. In this but-for world, players in the CHL and Division I would receive higher wages than they do now.

118. <u>Lower output</u>. The Boycott leads to lower output in the Elite Young Player Services Market on a market wide basis by forcing two categories of players out of the market.

119. One, players who want to play Division I hockey but are not yet old enough are forced to play in the USHL, Canadian Junior A leagues, or elsewhere or not at all; absent the Boycott, these players could, and would, play in the CHL and would thus remain in the Elite Young Player Services Market.

120. Two, current and former CHL players who decide they want to play Division I hockey are forced to play Canadian college hockey (or elsewhere) instead. Absent the Boycott, these players could, and would, play Division I hockey and would thus remain in the Elite Young Player Services Market too. Consistent with this analysis, one commentator posited that, if the Boycott ends, the number of Division I teams would increase because the pool of qualified players would increase.

121. <u>Lower quality playing experience</u>. Because the Boycott forces otherwise qualified players out of the Elite Young Player Services Market, it reduces the overall quality of the playing

experience in that market, thus reducing the value that players derive from supplying their labor in that market and the likelihood that those players will have successful professional careers.

122.    For all of these reasons, it is unsurprising that commentators have concluded that "the players" would "benefit the most" if the NCAA and its member institutions ended their Boycott of CHL players.

### i.    The Boycott Caused CHL Players to Lose Scholarships

123.    The Boycott has caused current and former CHL players, including Plaintiffs, to lose out on the lucrative full-ride Division I scholarships that they would have otherwise received.

124.    To be clear, former and current CHL players are harmed by the Boycott regardless of whether they would have obtained a full-ride Division I scholarship in the but-for world. Indeed, among other harms, anyone who played in the CHL received artificially suppressed wages as a result of the conduct alleged herein.

### i.    CHL players are capable of playing NCAA Division I hockey

125.    Current and former CHL players are fully capable of playing Division I hockey. Indeed, commentators agree that the level of play in Division I and the CHL is comparable—even though CHL players are younger.

126.    If players the same age are compared, many more players are drafted by NHL teams from the CHL than from Division I and the USHL combined each year. This demonstrates that CHL players are, on average, considered to have greater potential to play professional hockey.

127.    Underscoring the high level of play in the CHL, the concentration of NHL-drafted players is likewise higher in the CHL than in Division I. Indeed, notwithstanding that many CHL players are too young to be drafted by the NHL (for the 2024 NHL Draft, players must be eighteen as of September 15, 2024), approximately 16 percent of OHL players have already been drafted.

The numbers for the WHL and QMJHL are comparable. In contrast, even though virtually all Division I players are old enough to be drafted by the NHL, a smaller percentage—approximately 13 percent—have been drafted by NHL teams.

128.    More than half of these players are on just ten teams: Boston College, Boston University, University of Denver, Harvard University, University of Massachusetts, University of Michigan, University of Minnesota, University of Minnesota-Duluth, University of North Dakota, and University of Wisconsin. Approximately one-third of Division I teams do not have a player who was drafted by an NHL team.

129.    Accordingly, as one would expect, Division I hockey has considerably less parity than CHL hockey. For example, winning percentages for teams in Division I hockey range from 3.57% (Stonehill) to 81% (Boston College); in the OHL, the range is from 35.5% (Niagara) to 75.5% (London). Division I's lower-end teams, in particular, would be eager to purchase labor from current and former CHL players. That is why the coaches of at least some of those teams favor ending the Boycott: they need and want CHL players to effectively compete in the NCAA. Put differently, the lack of parity in Division I underscores that, absent the Boycott, Division I teams—especially those that have been less successful—would aggressively compete for the services of current and former CHL players.

130.    Very rarely, the NCAA has permitted CHL players to play Division I hockey (on information and belief, these were oversights). These examples, though rare, demonstrate that CHL players are readily able to succeed in NCAA Division I hockey.

131.    For example, in the wake of the COVID-19 pandemic, Austen Swankler—who had played a season with the OHL's Erie Otters—was permitted to play for Bowling Green State University's Division I team. In his first season at Bowling Green, he was among the best players,

finishing second in team scoring, just three points back from the team leader. While playing for Erie, Mr. Swankler finished thirty-three points back from the team's leading scorer and even scored fewer points than one of the team's defenseman, current NHL player Jamie Drysdale.

132.     As another example, Brayden Gelsinger was permitted to play for Lake Superior State University, where he received a scholarship, after having played twelve games for the WHL's Kamloops Blazers. Mr. Gelsinger scored no points while playing for Kamloops; he subsequently played four years for Lake Superior State, where he accumulated sixty-four points.

ii.     CHL players would choose to play in Division I hockey in the but-for world

133.     CHL players are not only capable of playing Division I hockey; many of them would also choose to play Division I hockey over other options, especially Canadian college hockey, in the absence of the Boycott.

134.     To be sure, CHL teams offer players in the Elite Young Player Services Market an essentially-unmatched chance of eventually playing in the NHL Leagues and, compared to Division I, the opportunity to play more games against highly-skilled opponents (both because CHL teams play more games than Division I teams, and because the CHL has more parity than Division I). At the same time, certain differences between the CHL and Division I make Division I attractive to many current and former CHL players as their careers progress.

135.     For example, in contrast to Division I players, CHL players are not concurrently working toward a college degree. Some players who decide to join CHL teams may subsequently decide that a degree would be beneficial for them, either as a hedge or for some other reason. The Boycott forces these players to obtain that degree from Canadian universities where they can play hockey at a lower level, or from American universities where they cannot play Division I hockey.

136.    In addition, the CHL has an age limit of twenty, while Division I players range in age from 17 and 26. Many CHL players are not necessarily ready to play in the NHL Leagues by the time they hit that limit but could be ready after playing a few additional years in a league like Division I.

137.    Similarly, CHL players may decide that playing in a league with older and stronger players, like Division I, would more optimally prepare them for playing in the NHL Leagues. Or they may decide that the CHL is not the best place for them—for example, they may be dissatisfied with the amount of playing time that they are receiving. The Boycott precludes these players from doing what would be best for them, *i.e.*, playing for a team in Division I.

138.    As a result of the Boycott, many of the players in the situations described above are effectively forced to play college hockey in Canada; indeed, as noted above, approximately 1,000 former CHL players are playing in Canadian college hockey leagues. That option is considerably less attractive than Division I for two primary reasons.

139.    First, the level of competition is much lower. Exceedingly few Canadian college hockey players ultimately play professionally.

140.    Second, the athletic scholarships are far less generous. Canadian colleges limit scholarships to tuition and other academic expenses, whereas Division I teams also cover room, board, and other living expenses. In addition, Canadian colleges only offer athletic scholarships to players who satisfy stringent academic requirements (*e.g.*, 80% average in their final year of high school); the same is not true of Division I schools. One Canadian college's athletic director summed it up: "We can't compete with that."

141.    Experts predict that, if the Boycott ends, former CHL players who would otherwise be forced to play college hockey in Canada would flock to Division I.

142.     Indeed, when asked whether Canadian college teams would lose players to Division I if the Boycott were lifted, one expert responded: "Absolutely they will." Commentators from the publication *The Hockey News* likewise predicted, if the Boycott were lifted, that "may ultimately lead to a massive talent drain from the Canadian university ranks." Another predicted that Canadian universities "would most likely lose many of their players to the NCAA because they have better programs than Canadian universities." Yet another predicted that "countless CHL grads who would have otherwise stayed in Canada" would be "entic[ed]" to "cross the border for NCAA programs."

143.     For current and former CHL players in the situations described above (or similar situations), Division I hockey is also more attractive than other alternatives, like the USHL or Canadian Junior A, where the level of play is lower, the players are not older or stronger, and players cannot simultaneously earn college degrees. Further, former CHL players are often too old to play in the USHL or Canadian Junior A leagues, making those leagues not options at all.

144.     In short, absent the Boycott, current and former CHL players would play Division I hockey instead of pursuing other options and would receive valuable athletic scholarships.

## V.     CLASS INJURY AND STANDING

145.     Plaintiffs and the class have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' conduct unlawful.

146.     Plaintiffs and the class allege that Defendants' anticompetitive conduct has caused them to sell their labor for below-competitive prices, to lose out on valuable athletic scholarships, and to be excluded from Division I. Such injuries are plainly of the type the antitrust laws were intended to prevent.

147.     Defendants' misconduct has directly caused this injury to Plaintiffs and the class. Plaintiffs and the class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in selling their labor for reasonable rather than below-competitive prices.

## VI.     CLASS ALLEGATIONS

148.     Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of one class, which may comprise subclasses, to be defined based on discovery.

149.     The class (the "Class") comprises anyone who either (i) played in the CHL at any point between August 12, 2020, and the present, or (ii) attended college at any point between August 12, 2020, and the present after playing in the CHL.

150.     The Class excludes (i) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

151.     Plaintiffs reserve the right to amend the class definition if further investigation, discovery, or both indicate that such definition should be narrowed, expanded, or otherwise modified.

152.     The members of the Class are so numerous that joinder of all members is impracticable. The precise number of members of the Class is unknown to Plaintiffs at this time, but it is believed to be in the thousands.

153.     Defendants have acted on grounds that apply generally to the members of the Class, so that final injunctive relief is appropriate respecting the Class as a whole.

154.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Such common issues include:

    (a)  Whether the Boycott should be reviewed under the *per se* rule, the "quick look" rule, or the rule of reason;

    (b)  Whether the Elite Young Player Services Market is a cognizable antitrust market;

    (c)  Whether Defendants have market power in the Elite Young Player Services Market;

    (d)  Whether Plaintiffs and the Class have antitrust standing to challenge the Boycott;

    (e)  Whether the Boycott has produced anticompetitive effects in the Elite Young Player Services Market;

    (f)  Whether Defendants have a valid procompetitive justification for the Boycott;

    (g)  Whether any valid procompetitive justification could be achieved through less anticompetitive means; and

    (h)  Whether, and to what extent, Plaintiffs and the Class has suffered damages as a result of the Boycott.

155.    Plaintiffs' claims are typical of the claims of the other members of the Class they seek to represent.  Defendants' practices have targeted and affected all members of the Class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

156.    Plaintiffs will continue to fully and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel competent and experienced in antitrust class actions. Plaintiffs have no interests in conflict with those of the Class.

157.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

158.     The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.

159.     A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

160.     The interests of the members of the Class in individually controlling the prosecution of separate actions are theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

161.     As the damages suffered by some of the individual class members may be relatively small, the expense and burden of individual antitrust litigation makes it impossible for members of the Class to individually redress the wrongs done to them. Plaintiffs anticipate no difficulty in the management of this action as a class action.

162.     WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Class Representative, that counsel be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 1 of the Sherman Act
### (by Plaintiffs and the Class)

163.     Plaintiffs incorporate the allegations above.

164.     The Boycott constitutes an illegal horizontal agreement in restraint of trade, and thus violates Section 1 of the Sherman Act.

165. The Boycott is *per se* illegal. It is a horizontal agreement among competitors—the NCAA's Division I men's ice hockey teams—to boycott any player who has played in the CHL, and it was imposed, and continues to be imposed, for the purpose of harming the NCAA's chief competitor, the CHL.

166. In the alternative, the Boycott is illegal under the "quick look" mode of review, because an observer with even a rudimentary understanding of economics would conclude that it has an anticompetitive effect in the Elite Young Player Services Market. In the alternative, the Boycott is illegal under the rule of reason.

167. At all times throughout the Class Period, Defendants possessed market power in the Elite Young Player Services Market.

168. The Boycott caused anticompetitive effects in that market, including, as explained above, suppressed wages, reduced output, and reduced quality.

169. Defendants have no valid procompetitive justification for the Boycott, and even if they did, that end could be achieved through less anticompetitive means.

170. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and the Class have suffered pecuniary injury.

171. To the extent that Defendants' conduct caused harm to foreign citizens in Canada, that conduct involved import trade and commerce because it precluded those citizens from selling their labor and services to NCAA Division I teams in the United States.

172. Defendants' conduct had and has direct, substantial, and foreseeable effects on trade and commerce in the United States. Specifically, as a result of the Boycott, (i) NCAA Division I teams do not buy labor and services from Plaintiffs and other current and former CHL players; (ii) NCAA Division I teams buy less labor in general (*i.e.*, output is lower); (iii)

compensation in the CHL (which is uniform), including for the many CHL teams based in the United States, is lower; (iv) competition between NCAA Division I teams and CHL teams is suppressed (which leads to less compensation for players, lower quality leagues, and lower output); and (v) competition in the Elite Young Player Services Market is suppressed (which, again, leads to less compensation for players, lower quality leagues, and lower output).

173.     Plaintiffs and each Class Member's claims arise out of, and are proximately caused by, the foregoing domestic effects of Defendants' conduct.

174.     Under section 4 of the Clayton Act, Plaintiffs and the Class are entitled to treble damages and reasonable attorneys' fees for these injuries.

175.     Under section 16 of the Clayton Act, Plaintiffs and the Class are also entitled to injunctive relief.

### DEMAND FOR JURY TRIAL

176.     Plaintiffs respectfully demand a jury trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the classes;

(b) Require Defendants to pay for sending notice to the certified classes;

(c) Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(d) Issue an injunction to enjoin Defendants from continuing to engage in the anticompetitive conduct alleged in this Complaint;

(e) Award compensatory damages to Plaintiffs and the proposed classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.


Dated: September 25, 2024

By: */s/ Edward Normand*

Velvel (Devin) Freedman (*phv forthcoming*)
Edward Normand (*admitted phv*)
Amos Friedland (*phv forthcoming*)
Richard A. Lafont
Stephen Lagos (*admitted phv*)
**FREEDMAN NORMAND**
**FRIEDLAND LLP**
10 Grand Central
155 E. 44th Street, Suite 905
New York, New York 10017
Tel: (646) 350-0527
Email: vel@fnf.law
Email: tnormand@fnf.law
Email: afriedland@fnf.law
Email: rlafont@fnf.law
Email: slagos@fnf.law

Eric L. Cramer (*phv forthcoming*)
Patrick F. Madden (*phv forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ecramer@bm.net
Email: pmadden@bm.net

Robert E. Litan (*phv forthcoming*)
Hope Brinn (*phv forthcoming*)
**BERGER MONTAGUE PC**
1001 G Street, NW Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
Email: rlitan@bm.net
Email: hbrinn@bm.net

Joshua P. Davis (*phv forthcoming*)
**BERGER MONTAGUE PC**
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel: (800) 424-6690
Email: jdavis@bm.net

*Counsel for Plaintiffs and the Proposed Class*