UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| RYLAN MASTERSON and NICHOLAS AVAKYAN, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. 1:24-cv-754-GWC |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, CANISIUS UNIVERSITY, NIAGARA UNIVERSITY, ROCHESTER INSTITUTE OF TECHNOLOGY, BOSTON COLLEGE, BOSTON UNIVERSITY, UNIVERSITY OF DENVER, QUINNIPIAC UNIVERSITY, UNIVERSITY OF NOTRE DAME DU LAC, STONEHILL COLLEGE, and UNIVERSITY OF ST. THOMAS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON MOTION TO DISMISS**
**(Doc. 62)**

This antitrust case arises out of an eligibility rule, previously adopted by the National Collegiate Athletic Association ("NCAA"), that barred junior hockey players who had played in the Canadian Hockey League ("CHL") from playing for college teams competing in NCAA Division I hockey. Plaintiffs filed this lawsuit on August 13, 2024. On November 7, 2024, the NCAA Division I Council voted to amend the eligibility requirements to allow CHL players to apply to NCAA schools competing in Division I hockey. The parties agree that this rule change renders any claim for prospective injunctive relief moot. The remaining claims concern money damages only.

Defendants have filed a motion to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim upon which relief can be granted.

### Factual Background

The CHL is an elite hockey league open to junior players up to 20 years of age. (Doc. 37 ¶ 5.) Division I is composed of college and university players in the United States. (*Id.* ¶ 4.) The amended complaint identifies CHL and Division I competition as the principal routes by which young players find their way into the National Hockey League ("NHL"). (*Id.* ¶ 3.)

The CHL is an umbrella organization composed of three separate leagues: the Western Hockey League ("WHL"), the Ontario Hockey League ("OHL"), and the Quebec Maritimes Junior Hockey League ("QMJHL"). (*Id.* ¶¶ 29–30.) Combined, some sixty teams compete across the entire CHL. (*Id.* ¶¶ 31, 33, 35.) Most CHL teams are based in Canada, with a handful in the United States. (*Id.*) Similarly, most players are Canadian. (*Id.* ¶¶ 32, 34, 36.) Most of the remainder come from the United States. (*Id.*) Players are drafted by a team and may be traded. (*Id.* ¶ 79.) They have little control over where they will play, outside of which of the three leagues they join. (*Id.* ¶¶ 79, 90.) In the CHL, the players receive a stipend of $600 a month to cover living expenses, which is categorized as an expense allowance, not income. (*Id.* ¶ 56.)

The NCAA is a self-governing association of 1,100 member schools that regulates intercollegiate sports in the United States. (*Id.* ¶¶ 16–17.) Schools that wish to participate in the NCAA must follow the NCAA bylaws that are devised and agreed upon by the schools themselves. (*Id.* ¶ 17.) Division I hockey, which is the highest level of play, has over sixty schools competing against each other. (*Id.* ¶ 49.) For Division I, "[players] range in age from 17 to 26," and some teams provide scholarships to players on the team. (*Id.* ¶¶ 49–50.) The

2

scholarships available in American Division I universities are significantly more than the equivalent provided at Canadian colleges. (*Id.* ¶ 68.)

The CHL and Division I are generally considered to have similar levels of play, even as the CHL typically fields younger players. (*Id.* ¶¶ 58, 125.) CHL players are considered, on average, to have greater potential to play professional hockey, and the concentration of NHL-drafted players is higher in the CHL than in Division I. (*Id.* ¶¶ 126–27.) There is also considerably less parity among Division I teams than CHL teams. (*Id.* ¶¶ 128–129.) Winning percentages in Division I range from 3.57% to 81%, whereas the CHL has a range from 35.5% to 75.5%. (*Id.* ¶ 129.) Additionally, a smaller percentage of players already drafted to NHL teams play in Division I than the CHL, with over half of the drafted players playing on only ten Division I teams. (*Id.* ¶¶ 127–28.)

Prior to the rule change in 2024, three NCAA bylaws, identified as Bylaws 12.2.3.2, 12.2.3.2.1, and 12.2.3.2.3, excluded CHL players from Division I competition. (*Id.* ¶¶ 91–95.) Section 12.2.3.2 excluded any player who has "ever competed on a professional team." (*Id.* ¶ 92.) Section 12.2.3.2.1 allowed former professional players to join Division I teams in sports "other than men's ice hockey and skiing." (*Id.* ¶ 93.) Section 12.2.3.2.3 identifies CHL teams as professional. (*Id.* ¶ 94.) Because young players can choose to play for the CHL at the age of sixteen, the NCAA amended its traditional rules around age of recruitment to allow Division I teams to recruit players as early as their sophomore year of high school. Plaintiffs allege this provision was specifically "tailored to permit Division I teams to compete with CHL teams for young players." (*Id.* ¶ 61.)

A waiver process permitted some CHL players to play Division I hockey on a case by case basis. (*Id.* ¶ 130.) Bylaw 12.2.3.2.4.1 states that an appeal for restoration of eligibility

3

"may be submitted on behalf of an individual who has participated on a major junior ice hockey team." (Doc. 62-2 at 16.) Plaintiffs allege that this waiver is rarely successful. (Doc. 37 ¶ 130.) They provide two examples of former CHL players who were admitted to a Division I school: Austen Swankler, who was allowed to play for Bowling Green State University after a season in the OHL with the Erie Otters in the wake of the COVID-19 pandemic, and Brayden Gelsinger, who was permitted to play for Lake Superior State University after 12 games with the WHL's Kamloops Blazers. (*Id.* ¶¶ 131–32.) Plaintiffs describe these players as "oversights" rather than examples of players successfully obtaining the waiver. (*Id.* ¶ 130.)

Plaintiffs characterize the pre-2024 eligibility restrictions as an illegal boycott (the "Boycott") "imposed… for the purpose of harming the NCAA's chief competitor, the CHL." (*Id.* ¶ 165.) The alleged members of the boycott are the NCAA and its member schools that compete in Division I hockey. The parties who are the alleged subject of the Boycott are young men who have played in the CHL already or are considering it. These players are threatened with exclusion from Division I if they join a CHL team. Plaintiffs allege that the Boycott causes anticompetitive effects in the market for "Elite Young Players Services" including "suppressed wages, reduced output, and reduced quality." (*Id.* ¶ 168.)

Plaintiffs define the relevant labor market or "Elite Young Players Service Market" as "elite young male hockey players . . . between the ages of sixteen and twenty-two who have sufficient skill to play in the most competitive non-NHL Leagues in North America." (*Id.* ¶ 69.) These players "supply their labor to teams, which profit from that labor in the form of ticket, merchandise, and other sales. Those teams, in turn, compete for that labor, with the understanding that better players lead to higher ticket sales and more revenue." (*Id.*) For the

4

players that compose this market, only the CHL and Division I are considered suitable employers. (*Id.* ¶ 71.)

The amended complaint alleges that Plaintiff Masterson lost his NCAA eligibility after playing in two exhibition games for a CHL team when he was 16 years old. Plaintiff Avakyan lost eligibility after playing for three years for CHL teams, starting when he was 16. Both Plaintiffs have graduated from high school. They allege that they were "ready, willing, and able to play NCAA Division I hockey" and were prevented from doing so by the eligibility requirement. (*Id.* ¶¶ 10–14.)[1]

Plaintiffs seek to represent a class of junior hockey players subject to the same NCAA eligibility bar they faced prior to the rule change. They define the class as "anyone who either (i) played in the CHL at any point between August 12, 2020, and the present, or (ii) attended college at any point between August 12, 2020, and the present after playing in the CHL." (*Id.* ¶ 149.)

## Rule 12(b)(1) Standard -Standing

"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank*, 547 F.3d 167, 170 (2d Cir. 2008) (internal citation and quotation marks omitted). "The task of the district court is to determine whether the [p]leading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *John v. Whole Food Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017) (cleaned up). In conducting this analysis, the court

---

[1] Plaintiff Avakyan played for a Division 1 team as of the 2025-2026 season. *2025-26 Men's Hockey Roster: Nick Avakyan*, Clarkson University Athletics, https://clarksonathletics. com/sports/mens-ice-hockey/roster/nick-avakyan/8984. He seeks damages for the delay in his eligibility caused by the NCAA bylaws before the rule change in November 2024.

"accept[s] as true all material factual allegations of the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* at 736 (cleaned up).

Standing is a foundational element of subject matter jurisdiction. It arises from the case or controversy requirement of Article III and limits the jurisdiction of the federal courts to claims of legally sufficient injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). In the antitrust context, courts distinguish between constitutional standing, applicable to all plaintiffs in federal court, and the heightened requirement of "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

### Rule 12(b)(6) Standard

Defendants also seek dismissal under Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "must plead 'enough facts to state a claim to relief that is plausible on its face.'" *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In evaluating a Rule 12(b)(6) motion, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trs. of Upstate N.Y. Eng'rs.*, 848 F.3d at 566) (internal quotation marks omitted). "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

6

<u>Analysis</u>

Defendants seek dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and 12(b)(6) for failure to state a claim. (Doc. 62-3 at 2–3). They argue that Plaintiffs lack both constitutional standing and antitrust standing. (*Id.* at 9, 12). They also argue that Plaintiffs have failed to state a Section 1 per se claim or a rule of reason claim. (*Id.* at 18–19).

## I.    Constitutional Standing

The Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. "For a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025). To demonstrate standing, "plaintiffs must show that they possess a personal stake in the dispute and are not mere bystanders." *Id.* (internal quotation marks and citation omitted). This showing involves three elements: "injury in fact, causation, and redressability." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Generally, the injury-in-fact requirement means that a plaintiff must have personally suffered an injury." *Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 64 (2d Cir. 2025) (internal quotation marks and citation omitted).

Here, Defendants argue that Plaintiffs lack constitutional standing to sue because they have failed to plausibly plead that they suffered an injury in fact. In the alternative, Defendants assert that Plaintiffs cannot show a causal connection between their injury and the Boycott. (Doc. 62-3 at 14.) Plaintiffs respond that they have plausibly alleged three distinct injuries, all of which are traceable to the Boycott: (1) Plaintiffs were excluded from playing Division I hockey; (2) "they were deprived of valuable athletic scholarships from Division I schools"; and (3) they

7

received lower wages from the CHL than they would have absent the Boycott. (Doc. 67 at 13–14.)

Plaintiffs agree with Defendants that as players who participated in the CHL, they cannot demonstrate standing by pleading that the Boycott injured the CHL or that it injured players who were deterred from playing in the CHL. (Doc. 67 at 14 (stating, in response to Defendants' motion, that "Plaintiffs are not asserting claims for injuries to the CHL" or "derivative of those suffered by the CHL"; also stating that the "Boycott need not have deterred Plaintiffs from playing in the CHL to have injured them").) The court focuses instead on the alleged injuries that Plaintiffs they suffered themselves.

Plaintiffs allege that the Boycott injured them because it prevented them from playing Division I hockey. As they see it, the NCAA designed the Boycott to deter young players from joining the CHL, but it need not have deterred *them* to have caused them to suffer a concrete injury. "To the contrary," they argue, "a plaintiff suffers [an] . . . injury-in-fact . . . where, as here, he does 'not yield' to the defendant's 'coercive pressure' to take a particular action but instead bears the 'sanction' imposed by the defendant." (Doc. 67 at 14 (citing *Blue Shield of Va. v. McCready*, 457 U.S. 465, 483–84 (1982)).) The sanction in this case was ineligibility for Division I hockey. They allege that their exclusion from Division I led to diminished opportunities to play hockey at the college and professional levels; loss of scholarship and other benefits available to Division I players; and a loss of bargaining power for higher wages in the CHL.

## A.    Whether Plaintiffs are Qualified to Play Division I Hockey

Defendants do not challenge the assertion that exclusion from Division I hockey can constitute an injury in fact. They argue instead that Plaintiffs have failed to plausibly plead

8

causation in their particular case.  Their first line of attack is their contention that Plaintiffs have

not alleged that they were "qualified to attend *any* Division I school or [were] of the caliber to

earn a roster spot, let alone a coveted scholarship." (Doc. 62-3 at 17.)  In Defendants' view,

Plaintiffs' lack of skill—not the Boycott—prevented them from playing Division I hockey.

Regarding Mr. Masterson, Defendants emphasize that he only played two exhibition games for a

CHL team, "was never signed to a CHL roster[,] and has not been playing for the most

competitive non-NHL leagues in North America." (Doc. 62-3 at 16 (internal citation and

quotation marks omitted).)  "Plaintiffs do not allege that *any* Division I school was interested in

recruiting Mr. Masterson prior to or after his two exhibition games." (*Id.*)  As for Mr. Avakyan,

Defendants acknowledge that he played three seasons of CHL hockey but point out that, after his

third season, he "was not re-signed by another CHL team" and has since "been playing with a

lower-level Junior A team and then an NAHL team [both lower level junior hockey leagues]."

(*Id.*)  As with Mr. Masterson, the Amended Complaint includes no allegations that any Division I

school attempted to recruit Mr. Avakyan.  (*Id.*)

The court agrees with Plaintiffs that they have plausibly pled that they have the skill to

play Division I hockey.  The Amended Complaint alleges that both Mr. Masterson and Mr.

Avakyan are high school graduates and are "ready, willing, and able to play Division I hockey."

(Doc. 37 ¶¶ 11, 14.)  Those are factual allegations, not legal conclusions, and the court must

accept them as true for the purposes of this motion.  If those allegations were not enough,

Plaintiffs also support them with more detailed pleadings.  Most notably, the Amended

Complaint contains numerous allegations regarding the quality of play in the CHL, which

Plaintiffs generally describe as similar to or higher than in Division I hockey.  (*Id.* ¶¶ 53, 125.)

Applying these general allegations to Mr. Masterson and Mr. Avakyan in particular, it is plausible that in the relevant time period both plaintiffs had the skill required to play Division I hockey. Mr. Avakyan played three seasons of CHL hockey, a league with a level of play higher than or comparable to that of Division I hockey. Even though he was not signed to play a fourth year, Mr. Avakyan's three years of play make it plausible that he could have played Division I hockey if permitted to apply.

As for Mr. Masterson, it is true that he played only two CHL exhibition games. He was sixteen years old when he played those games, indicating that he was already a high-caliber player. (*See id.* ¶ 10.) Most athletes improve during high school, as they practice more and become more physically mature. It is not surprising, therefore, that the United States Hockey League and Canadian Junior A Hockey League, though lower in quality of play than the CHL and Division I, are the primary feeders to Division I hockey. (*Id.* ¶¶ 65, 67.) The situation is analogous to athletes in other sports who play for their high school teams, then progress to college athletics; although they likely lacked the skill to play on a college team *during high school*, the most skilled players may well develop that talent by the time they graduate. Here, the fact that Mr. Masterson was given the opportunity to play exhibition games in the CHL indicates a high level of talent and the potential to become good enough for Division I. Moreover, because there is greater variation in the quality of Division I teams than CHL teams, it is plausible that Mr. Masterson could have played for a lower-ranked Division I team even though he did not sign with a CHL team when he was sixteen.

**B.    Whether Plaintiffs Could Have Benefitted from an Exception to the Boycott**

Defendants raise a second issue regarding causation: "neither [Plaintiff] alleges he applied for admission to any of the University Defendants." (Doc. 62-3 at 7.) Plaintiffs respond

10

that applying for admission would have been futile in light of the Boycott. (Doc. 67 at 16.) Defendants reply that Plaintiffs' futility argument fails because they have "acknowledge[d] that the NCAA bylaws provide a waiver process" for players seeking to avoid the Boycott. (Doc. 70 at 8 n.1.)

"Ordinarily, to establish standing to challenge an allegedly discriminatory program, a plaintiff must make an application. 'But a plaintiff need not go through the motions of formally applying when that would be a futile gesture.'" *Variscite NY Four, LLC v. N.Y.S. Cannabis Control Bd.*, 152 F.4th 47, 56 (2d Cir. 2025) (quoting *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025)) (further internal citation and quotation marks omitted). Rather, "[i]t is enough to 'demonstrate that they are able and ready to apply, but a discriminatory policy prevents them from doing so on equal footing.'" *Id.* (quoting *Do No Harm*, 126 F.4th at 118.)

The question of futility often arises in the context of ripeness, an issue that "overlaps with the standing doctrine." *Id.* at 58 (internal quotation marks and citation omitted). To be ripe, a cause of action must present "a real, substantial controversy, not a mere hypothetical question." *Id.* (quoting *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 293 (2d Cir. 2022)). When a plaintiff fails to apply for a benefit, their cause of action may not be ripe because it is not yet clear whether the predicted harm—rejection of the application—will occur. At the same time, "courts within this circuit do not require 'a futile gesture as a prerequisite for adjudication in federal court.'" *Cruz v. Zucker*, 116 F. Supp. 3d 334, 349 (S.D.N.Y. 2015) (quoting *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir. 1999)).

"[C]onclusory or unsupported allegations of futility will not suffice" to overcome a ripeness or standing challenge. *E. End Eruv Ass'n, Inc. v. Village of Westhampton Beach*, 828 F. Supp. 2d 526, 536 (E.D.N.Y. 2011). And "'[t]he Second Circuit has repeatedly . . . conclude[d]

11

that a plaintiff who fails to submit to the procedural requirements of a law or policy that offers an

exemption or other relief from its mandate does not have standing to challenge the restrictions

imposed by the law or policy,' unless the plaintiff shows that the application for the exemption

was futile." *Walker v. N.Y.S. Dep't of Health*, 788 F. Supp. 3d 427, 475 (E.D.N.Y. 2025)

(alterations in original; quoting *Wade v. Univ. of Conn. Bd. of Trs.*, 554 F. Supp. 3d 366, 377

(D. Conn. 2021)).

In arguing that Plaintiffs could have applied for a waiver, Defendants cite to NCAA

Bylaws 12.2.3.2.4.1 and 12.12,[2] as well as the Amended Complaint at paragraphs 130 to 132.

Bylaw 12.2.3.2.4.1 reads as follows:

> **12.2.3.2.4.1 Limitation on Restoration of Eligibility.** An appeal for restoration
> of eligibility may be submitted on behalf of an individual who has participated on
> a major junior ice hockey team under the provisions of Bylaw 12.12; however, such
> individual shall be denied at least the first year of intercollegiate athletics
> competition in ice hockey at the certifying institution and shall be charged with the
> loss of at least one season of eligibility in ice hockey.

(Doc. 62-2 at 16.) Bylaw 12.12 reads, in relevant part:

> **12.12.1 Basis for Appeal.** When a student-athlete is determined to be ineligible
> under any applicable provision of the constitution, bylaws or other regulations of
> the Association, the member institution, having applied the applicable rule and
> having withheld the student-athlete from all intercollegiate competition, may
> appeal to the Committee on Student-Athlete Reinstatement for restoration of the

---

[2] On a motion to dismiss, the district court can consider "the facts alleged in the
complaint, documents attached to the complaint as exhibits, and documents incorporated by
reference in the complaint." *Revitalizing Auto Cmtys. Env't Response Trust v. Nat'l Grid USA*,
92 F.4th 415, 436 (2d Cir. 2024) (internal quotation marks and citation omitted). "Moreover,
even if a document is not expressly incorporated by reference, the court may still consider it if
the complaint 'relies heavily upon its terms and effect,' rendering the document 'integral to the
complaint.'" *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).
Plaintiffs have not objected to Defendants' reliance on the NCAA bylaws, a portion of which are
attached as an exhibit to the Motion to Dismiss. (*See* Doc. 62-2.) Additionally, the Plaintiffs'
entire case centers around the NCAA bylaws and their "terms and effect," making the document
integral to the Amended Complaint. It is therefore appropriate for the court to consider the
bylaws, as excerpted in Doc. 62-2.

student's eligibility, provided the institution concludes that the circumstances warrant restoration of eligibility.

(*Id.* at 17.) As for the Amended Complaint itself, paragraphs 130 through 132 describe two instances in which CHL players have been allowed to play Division I hockey, though Plaintiffs attribute those exceptions to "oversights" by the NCAA, not an official waiver process. (Doc. 37 ¶ 130.)

Bylaw 12.2.3.2.4.1 does not support Defendants' standing argument. To the contrary, it establishes that even CHL players who manage to restore their eligibility cannot play hockey their first year of college and can play for a maximum of three seasons, even if they continue their education with a graduate program. Though less harsh than a full ban on eligibility, the terms of the waiver still inflict an injury on CHL players: loss of training and playing time and, presumably, ineligibility for an athletics scholarship their first year of college. Moreover, it appears that a university can apply for a waiver on a player's behalf only after that player has enrolled in college there. That is a large gamble to take given Plaintiffs' allegation that the NCAA permits CHL players to compete only "[v]ery rarely." (Doc. 37 ¶ 130.)

The court will not dismiss the Amended Complaint on the ground that Plaintiffs failed to apply for waivers. Plaintiffs' allegations that the waivers were infrequently granted and failed to confer full eligibility for a four-year career in Division I raise factual issues that may defeat Defendants' claim that the eligibility rules caused no injury to these players.

## C.    Whether CHL Contracts Prohibit Players from Transferring to Division I Hockey

Finally, in their reply, Defendants argue that exclusivity provisions in CHL contracts— not the Boycott—prevent CHL players from playing Division I hockey. For this proposition, Defendants cite to Plaintiffs' response to the Motion to Dismiss, where Plaintiffs state that the "CHL comprises three leagues—the QMJHL, OHL, and WHL—which have exclusive rights

13

over players in their respective territories." (Doc. 67 at 3.) They also cite *World Association of Icehockey Players Unions North America Division v. National Hockey League*, No. 24-CV-01066, 2024 WL 4893266, at *3 (S.D.N.Y. Nov. 26, 2024), for the proposition that the CHL "prohibit[s] [p]layers via contractual provisions in their respective Standard Player Agreements ('SPAs') from providing their hockey services to any club other than the [CHL team] that drafted the [p]layer until he reaches the age of 20." (Doc. 70 at 9.)

Judge Garnett's decision in *World Association of Icehockey Players* addresses issues of personal jurisdiction, not standing. Although it does not reach the merits, the antitrust claims in the case concerned restrictions on players' freedom to move among the leagues that make up the CHL. The case has little application to the exclusion of players from Division I colleges. In dismissing the complaint on minimum contact grounds, the court recognized that "[p]rospective market entrants may in some circumstances suffer antitrust injury where they were thwarted from entering the market due to antitrust violations." 2024 WL 4893266, at *9. The court dismissed the case despite recognizing potential injury to the players because "none of the named Plaintiffs could plausibly establish that they suffered [antitrust injury] in New York." *Id.*

In reviewing the complaint, the court is satisfied that plaintiffs allege sufficient injury in fact to establish constitutional standing. They have pled in plausible detail that they were high-level junior hockey players who were barred from playing at a comparable Division I level due to what they describe as an anti-competitive boycott. Accepting these allegations as true for purposes of the motion to dismiss, the NCAA eligibility rules foreclosed a tangible opportunity to attend college on an athletic scholarship, to complete at a national level, and to seek to progress to the professional league. These are injuries-in-fact caused by the Boycott and sufficient to meet Article III standing requirements.

14

## II.    Antitrust Standing

Before discussing the question of antitrust standing in detail, the court considers the larger picture before the rule change in 2024. The CHL and Division I stand at the apex of youth hockey in North America. Each has slightly more than 60 teams composed of 26 players. Both draw from the limited pool of talented high-school-age players. The CHL players are younger (16–20) and live in relatively austere billet housing in cities and towns across Canada. Division I players are campus athletes, often on scholarships and greatly admired within their communities.

Before the rule change, the NCAA eligibility rules disqualified any CHL player, including those who had played only a few games on an exhibition basis, from playing for a Division I team. These eligibility rules had their origin in the desire to preserve the amateur nature of American college sports. Hundreds of CHL players, including American high school students, were barred from Division I competition each year. The obvious effect of the eligibility rules was to discourage 16- and 17-year-old players, too young to attend college, from entering the CHL.

The court draws a few initial conclusions from this general statement. The eligibility restrictions were highly significant in the world (or "market") of youth hockey. The CHL lost access to the hundreds of high school age players who intended to play hockey at an American college or university. The NCAA was able to direct these students away from the CHL and into lower-level development leagues until they reached college age. The Defendants observe at length that the restrictions did not seem to have much impact on the success of the CHL since it continued to send a higher percentage of players to the NHL than Division I. But the standard for whether a business practice violates the antitrust law is whether it reduces competition. On

15

their face and considered in broad generalities, the eligibility restrictions had a powerful impact in shaping the "market" each year for new recruits for both participants.

The court turns from this general discussion to the specific inquiry and analysis required by the Second Circuit in determining whether a plaintiff has successfully alleged antitrust standing. "Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws and entitles '[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws' to treble damages for those injuries." *Gatt Commc'ns, Inc.*, 711 F.3d 68, 75 (2d Cir. 2013) (quoting 15 U.S.C. § 15). "As the Supreme Court explained in its seminal decision addressing § 4 actions, however, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* (quoting *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 534 (1983)). Specifically, § 4 claims should advance "the purpose of the antitrust laws: to protect competition." *Id.*

Courts use the concept of "antitrust standing" to define the boundaries of antitrust actions. To demonstrate standing, a plaintiff must plausibly allege "(a) that [they] suffered a special kind of 'antitrust injury,' and (b) that [they are] a suitable plaintiff to pursue the alleged antitrust violations and thus [are] an 'efficient enforcer' of the antitrust laws." *Id.* at 76 (internal citation and quotation marks omitted). "This test forces antitrust courts to connect the alleged injury to the purposes of the antitrust laws." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 337 (4th Ed. 2019).

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), the Supreme Court identified multiple factors that determine whether a plaintiff has antitrust standing. These include:

16

- Whether the injury alleged falls within the purpose of the Sherman Act in "assur[ing] customers the benefits of price competition" and "protecting the economic freedom of participants in the relevant market." *Id.* at 538.

- "[T]he directness or indirectness of the asserted injury." *Id.* at 539.

- "[T]he potential for duplicative recovery or complex apportionment of damages" *Id.* at 544.

- "[T]he existence of more direct victims of the alleged conspiracy." *Id.* at 545.

The Second Circuit "has distilled these factors into two imperatives:  we require a private antitrust plaintiff plausibly to allege (a) that it suffered a special kind of antitrust injury and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws." *Gatt*, 711 F.3d at 76 (cleaned up).

### A.    Antitrust Injury

The Second Circuit has adopted a three-step process for determining whether a plaintiff satisfies the criteria for antitrust injury. *Gatt*, 711 F.3d at 76. "First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive." *Id.* (cleaned up). Next, the court "identif[ies] the actual injury the plaintiff alleges," which requires it "to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." *Id.* (internal citation and quotation marks omitted). Finally, the court compares "the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Id.* (internal citation and quotation marks omitted). "It is not enough for the actual injury to be 'causally linked' to the asserted violation." *Id.* (citing *Brunswick*, 429 U.S. at 489). "Rather, . . . the plaintiff must demonstrate that [their] injury is 'of the type the antitrust laws were intended to

17

prevent and that flows from that which makes [or might make] defendants' acts unlawful.'" *Id.* (last alteration in original; quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).

### 1.    Step One

Defendants contend that Plaintiffs fail at step one of the *Gatt* test because the Boycott has had no anticompetitive effect. Specifically, they argue that (1) the Boycott has not weakened CHL's ability to recruit talented players; (2) the Boycott does not harm inter-league competition between the CHL and Division I schools; and (3) the Boycott has not reduced the quality of play in the CHL and Division I.

As noted above, the first step in determining whether a plaintiff has plausibly alleged an antitrust injury is to "identify the practice complained of and the reasons such a practice is *or might be* anticompetitive." *Gatt*, 711 F.3d at 76 (emphasis added; cleaned up). As the Second Circuit noted in *Gatt*, "[t]he conditional phrasing of [] step [one]" matters a great deal: "[w]hen assessing antitrust injury, [the court] assumes that the practice at issue is a violation of the antitrust laws and [is], thus, in the difficult position of positing a rationale for the antitrust laws' prohibition of conduct that may, in fact, not be prohibited." *Id.* at 76 n.9 (internal citation omitted). The idea is to "distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it." *Daniel*, 428 F.3d at 437. At the first step of the analysis, then, a plaintiff "need allege only that the [d]efendants have engaged in unlawful anticompetitive conduct." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 63 (2d Cir. 2019).

*IQ Dental Supply* supplies a helpful example. In that case, the plaintiff alleged that the defendants engaged in a group boycott to exclude online vendors of dental products. The

18

plaintiff and defendants were all wholesalers that bought dental products, then resold them to dentists' offices. 924 F.3d at 60–61. The defendants sold their products via on-the-ground sales teams, while the plaintiff sold its products through an online portal where similar companies could also sell dental products. *Id.* at 61. The defendants then pressured dental-supply manufacturers to stop supplying companies that sold through the online model. *Id.* The plaintiff brought a lawsuit against the defendants alleging they had conspired to organize a group boycott of the online platform and companies that sold through the platform.

In this case, Defendants have pressured young hockey players not to join the CHL, just as the defendants in *IQ Dental Supply* pressured manufacturers to stop selling their product to online distributors. Obviously, a considerable number of players—including Plaintiffs—chose to play for the CHL anyway and suffer the consequences. But the anticompetitive behavior is the same in both cases and, according to Plaintiffs' allegations, had the same anticompetitive goal and effect: harming a competitor by limiting its access to sellers. In this case, of course, the mode of pressuring sellers was *itself* a threatened boycott if players did not comply, and Plaintiffs allege additional anticompetitive effects related to that issue.

In *IQ Dental Supply*, the Second Circuit's analysis of step one amounts to a brief paragraph. The court first concluded that the plaintiff had plausibly alleged that the defendants conspired to boycott online dental supply distributors. The court then stated that "[t]h[o]se allegations easily satisfy *Gatt*'s initial requirement," quoting to *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 2017, 212 (1959) for the proposition that "[g]roup boycotts . . . have long been held to be in the forbidden category [under the antitrust laws]." (penultimate and final alterations in original). So too here. Plaintiffs have plausibly alleged that Defendants conspired

19

to boycott players who had previously participated in the CHL, and they need not show anything more at step one.

### 2.    Step Two

At the second step of the *Gatt* test, the court must "isolate and identify [the plaintiff's] 'actual injury,' or the 'ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct.'" *IQ Dental Supply*, 924 F.3d at 63. The Second Circuit has treated this step as an assessment of whether a plaintiff has plausibly pled that they suffered the alleged harm. *See Sonterra Capital Master Fund, Ltd. v. UBS AG*, 152 F.4th 404, 410 (2d Cir. 2025) (holding that plaintiffs failed at step two of the *Gatt* test because they failed to plausibly allege that defendant's conduct had the potential to harm plaintiffs); *IQ Dental Supply*, 924 F.3d at 64 (analyzing, at *Gatt* step two, whether plaintiff had adequately alleged that defendants' conduct left it worse off).

In this case, Plaintiffs have identified three injuries: (1) their exclusion from Division I hockey; (2) the lost opportunity to receive athletic scholarships; and (3) lower wages for their participation in the CHL. Defendants respond that the Boycott did not place Plaintiffs in a worse position because (1) it did not deter them from playing in the CHL; (2) the NCAA bylaws include an appeals process for CHL players who wish to play Division I hockey; (3) Plaintiffs have not plausibly alleged that they would have received athletic scholarships; and (4) the Boycott did not affect CHL wages.

### a.    Exclusion from Division I Hockey

As with constitutional standing, the Boycott need not have prevented Plaintiffs from playing in the CHL to have harmed them. The Supreme Court addressed an analogous situation in *Blue Shield of Va. v. McCready*, where the defendant—a group health plan—"refus[ed] to

20

reimburse subscribers for psychotherapy performed by psychologists, while providing reimbursement for comparable treatment by psychiatrists." 457 U.S. 465, 467 (1982). The plaintiff alleged that the defendant was engaged in a "purposefully anticompetitive scheme" and "sought to induce its subscribers into selecting psychiatrists over psychologists." *Id.* at 483 (emphasis omitted). In other words, the defendant was allegedly coercing subscribers into boycotting psychologists.

The plaintiff in *Blue Shield* "did not yield to [the defendant's] coercive pressure, and bore [the defendant's] sanction in the form of an increase in the net cost of her psychologist's services." *Id.* The Court concluded that, even though it was the defendant's goal "to deprive psychologists of the patronage of [its] subscribers," the plaintiff was clearly worse off because of the defendant's conduct, and that harm was "clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479. The Court therefore reasoned that, "[a]lthough [the plaintiff] was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* at 483–84. That is, her injury flowed "from that which ma[de] [the] defendants' acts unlawful" and constituted an antitrust injury. *Id.* at 484.

The court already concluded above that Plaintiffs have plausibly pled that the Boycott prevented them from playing Division I hockey—or, at the very least, from playing four years of Division I hockey, given the possibility of obtaining a waiver. Like the plaintiff in *Blue Shield*, they "did not yield to [Defendants'] coercive pressure" and instead "bore [Defendants'] sanction." *Id.* at 483. Plaintiffs were therefore worse off than they would have been in a market free of anticompetitive distortion, and their injury was of the type that the antitrust laws were intended to prevent.

21

### b.    Loss of Athletic Scholarships

The Amended Complaint alleges that student-athletes who play Division I hockey "typically receive full-ride scholarships for their significant role in generating more than $150 million each year for colleges and universities." (Doc. 37 ¶ 4.)  By contrast, athletic scholarships at Canadian colleges and universities "are far more restrictive, both in amount . . . and with respect to conditions" for receiving a scholarship.  (*Id.* ¶ 68.)  Plaintiffs therefore contend that the Boycott "caused current and former CHL players, including Plaintiffs, to lose out on the lucrative full-ride Division I scholarships that they would have otherwise received."  (*Id.* ¶ 123.)

This alleged injury is entirely derivative of Plaintiffs' claim that they were barred from playing Division I hockey.  The exclusion from Division I hockey is an injury because of the many opportunities available to Division I players: opportunities to earn scholarships, receive skilled coaching, pursue a degree while playing in an elite league, earn stipends, get exposure to NHL recruiters, and more.  Plaintiffs will need to provide evidence regarding all of these issues to prove their damages, but the court will not treat the loss of athletic scholarships as a separate injury for the purposes of antitrust standing.

### c.    Suppressed CHL Wages

Plaintiffs allege that the Boycott suppressed wages for CHL and Division I players by reducing competition between the leagues.  They posit that, once a player chose to play a game with the CHL and lost eligibility for Division I, CHL effectively had a hold on those players; the only other leagues players could transfer to were of such a lower caliber that they are not viewed as reasonable substitutes.  They allege that, "[a]bsent the boycott, Division I teams would compete to lure players away from the CHL, and CHL teams would likewise compete to prevent those players from moving to the NCAA." (Doc. 37 ¶ 117.)

22

Defendants respond that Plaintiffs' allegations are conclusory, that CHL and Division I schools had been competing for players for decades without any change in CHL wages, and that CHL players get paid a fixed stipend, "rendering renegotiation of terms highly unlikely, if not impossible according to Plaintiffs['] own allegations." (Doc. 62-3 at 20.) They also argue that the Boycott, if anything, likely *increased* wages. (*Id.* at 18–19 ("In [Plaintiffs'] but-for world, as the labor pool increases, wages increase in parallel. But, in reality, supply and wages move inversely." (internal citations omitted)).)

As a preliminary matter, Mr. Masterson never earned a wage from the CHL because he only played exhibition games for the league. He cannot argue that he was personally made "worse off" by the Boycott's alleged effect on CHL wages. The following analysis applies only to Mr. Avakyan.

In *Pavia v. National Collegiate Athletic Association*, Circuit Judge Hermandorfer addressed a similar issue in her concurrence. As here, the NCAA argued that its eligibility rules did not suppress wages, reasoning that, under ordinary economic principles, "an increased worker supply . . . normally decreases worker wages." 154 F.4th 407, 420 (6th Cir. 2025). Circuit Judge Hermandorfer questioned that logic in the context of Division I football:

> In standard economic theory, wages reflect workers' marginal productivity—the value of their output. But football prowess and productivity are not distributed uniformly across players. Skill is highly differentiated, meaning lesser talent often is a poor substitute for greater talent. Top athletic performers can thus drive far greater output by their organizations than less-skilled replacement players. As a result, higher-skilled players may likewise command higher compensation and generate increased wage competition. If the [eligibility] [r]ule disproportionately excludes such high-earning-capacity players, it might drive down, not increase, Division I football compensation and product appeal. . . . [S]uch effects on price and output could prove cognizable antitrust harm.

*Id.* at 420–21 (Hermandorfer, C.J., concurring) (cleaned up).

Here, as in *Pavia*, there is reason to question whether the assumptions of standard economic theory would hold now that the Boycott has ended—though the factors cut both ways. On the one hand, Defendants correctly note that, even under the Boycott, the CHL and Division I already compete for players who have not yet played in either league, with NCAA rules allowing schools to start recruiting players on January 1 of their sophomore year in high school to align with the CHL's eligibility age of 16. (Doc. 37 ¶ 61.) Plaintiffs allege that the Boycott made it *harder* for CHL to recruit players, which might reasonably have incentivized the league to increase its wages to lure young talent. Without the Boycott, the cost of playing in the CHL has declined dramatically, so the CHL could theoretically lower its wages without hurting its ability to attract talent.

On the other hand, so long as the Boycott remained in place, no one in the market was competing for players who had *already* played a game with the CHL. Without the Boycott, competition for their labor could therefore only increase. Additionally, as in *Pavia*, Plaintiffs allege that the Boycott excluded highly talented players, as the CHL generally attracts better talent than Division I. There is also high variability in the quality of Division I teams, so lower-ranked teams would have a strong incentive to recruit talented CHL players. Thus, an increased number of NCAA-eligible players could very well increase wages for talented CHL players, as the CHL seeks to retain its players.

Defendants argue that these scenarios are highly unlikely because, under the Boycott, the CHL paid a set stipend, which, in Defendants' view, means it would not offer extra compensation to highly talented players to keep them from moving to Division I hockey. Just because the CHL offered a set stipend under the market conditions created by the Boycott does not mean it will continue to do so. As noted above, no one in the market was competing for

24

players who had already played for the CHL while the Boycott was in place, so the CHL had little reason to offer higher wages for more experienced or talented players. Absent the Boycott, however, the CHL could decide to increase the stipend for college-age players or could offer bonuses to particularly talented players. Since CHL players would no longer be excluded from Division I, CHL could face competitive pressure to offer better terms.

Defendants also make two assumptions about the market. First, they argue that wages will not increase absent the Boycott because the CHL could already attempt to lure players away from Division I with high wages or other benefits. The Plaintiffs contend that most competition under the Boycott was likely for players who have never played in either league for the simple reason that Division I players are, in addition to playing hockey, pursuing a college degree. The cost of abandoning that endeavor after starting college is high, so the ability of the CHL to lure away Division I players was likely low, particularly because the CHL accepts players only until they are 20. Plaintiffs assert that the CHL will raise wages to *retain* talent now that they are faced with the threat of its players leaving for Division I hockey.

Second, Defendants assume that the number of roster spots in the CHL and in Division I will remain the same without the Boycott. Plaintiffs explicitly challenge that assumption, alleging that the CHL and Division I will respond by adding more teams to their leagues. So, although the supply of labor would increase absent the Boycott, the demand for labor might very well increase, too.

At the motion-to-dismiss stage, Plaintiffs' allegations on this issue are sufficient. The court's task at this stage is not to determine which of the parties' competing economic accounts is more likely correct, but only whether the plaintiffs have plausibly alleged that the Boycott suppressed CHL wages. *See Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009). Undoubtedly the

25

parties will need to present evidence of how the CHL has, in fact, responded to the end of the

Boycott including any changes to player stipends, roster size, or recruitment practices, as well as

expert testimony addressing labor supply and demand in the market, in arguing whether or not

the Boycott had anticompetitive effects on CHL wages.

### 3.    Step Three

"Finally, at *Gatt's* third step[, Plaintiffs] must demonstrate that the Defendants'

anticompetitive behavior caused [their] actual injury." *IQ Dental Supply*, 924 F.3d at 64–65.  At

this stage, it is "not enough for the actual injury to be 'causally linked' to the asserted violation.

Rather, . . . the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were

intended to prevent and that flows from that which makes or might make defendants' acts

unlawful.'" *DirecTV, LLC v. Nexstar Media Grp., Inc.*, 162 F.4th 295, 309 (2d Cir. 2025)

(quoting *Gatt*, 711 F.3d at 76).

Regarding Plaintiffs' exclusion from Division I hockey, the court has already addressed

and rejected Defendants' arguments that Plaintiffs' injury stemmed not from the Boycott but

from their lack of talent, their failure to pursue a waiver, or the terms of their CHL contracts.

Moreover, an antitrust plaintiff "is not required to prove that defendant's alleged antitrust

violation was the *sole* cause of its injury; nor need plaintiff eliminate all other possible causes of

injury.  It is enough if plaintiff has proved that the alleged antitrust violation was a material cause

of its injury." *Discover Fin. Servs. v. U.S.A., Inc.*, 582 F. Supp. 2d 501, 504–05 (S.D.N.Y. 2008)

(quoting ABA Section of Antitrust Law, *Model Jury Instructions in Civil Antitrust Cases* (2005)

at F-3).  Plaintiffs have adequately pled that the Boycott caused their injury.

Plaintiffs' exclusion from the market also "flows from that which makes or might make

defendants' acts unlawful." *DirecTV, LLC*, 162 F.4th at 309 (quoting *Gatt*, 711 F.3d at 76).  As

26

in *Blue Shield*, discussed above, Defendants allegedly instituted the Boycott to hurt the CHL's ability to recruit players. And, like *Blue Shield*, the sanction for playing in the CHL—exclusion from Division I hockey—was at the very heart of the Boycott, a necessary component of Defendants' goal of harming competition. *See Blue Shield*, 457 U.S. at 479 (concluding that, even though it was the defendant's goal "to deprive psychologists of the patronage of [its] subscribers," the plaintiff was clearly worse off because of the defendant's conduct, and that harm of paying more for her care was "clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy").

Cases concerning barriers to market entry in sports leagues have reached the same conclusion. *See Clarett v. Nat'l Football League*, 306 F. Supp. 2d 379, 398 (S.D.N.Y. 2004), *rev'd on other grounds*, 369 F.3d 124 (2d Cir. 2004) ("Clarett's injury—his exclusion from the NFL—flows directly from the anticompetitive effects of the Rule [banning players fewer than three seasons out of high school], and thus constitutes antitrust injury.") (collecting cases). As the court in *Clarett* explained, "in a labor market—where the consumers of the labor are also usually the antitrust defendants—it makes little sense to require harm to consumers as a prerequisite for antitrust standing." *Id.* at 399. In such cases, "[a]ntitrust injury may arise from other anticompetitive effects, including barriers to market entry." *Id.*

With respect to CHL players' wages, it is again important to remember that this case concerns a labor market. Plaintiffs have alleged that Defendants' goal in instituting the Boycott was to harm CHL's ability to recruit players. The means by which they achieved that goal was to eliminate competition for the labor of players who played even a single game in the CHL—a powerful incentive for players to forgo joining the CHL. For players who, like Plaintiffs, chose to play for the CHL anyway, the foreseeable consequence was that they would only be able to

27

sell their labor to the CHL and would therefore have no bargaining power. The injury therefore flows directly from that which makes or might make Defendants' conduct illegal.

Moreover, the harm is of the type that Congress sought to address in passing antitrust laws; the Supreme Court has "emphasized the central interest [of the antitrust laws] in protecting the economic freedom of participants in the relevant market." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1983) (holding that beet growers could maintain antitrust action against refiners who had allegedly conspired to fix the price they would pay for beets, even though previous price-fixing cases had involved agreements among sellers to fix sales prices). And "[t]he statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." *Mandeville Island Farms*, 459 U.S. at 236. Here, the anticompetitive conduct of restricting players' freedom in the market—their freedom to sell to more than one buyer at different points in time—has allegedly had a direct effect on their wages. Plaintiffs have sufficiently pled antitrust injury.

### B.     Efficient Enforcer Requirement

To determine whether a plaintiff is an efficient enforcer, courts look at four factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*In re Platinum and Palladium Antitrust Litigation*, 61 F.4th 242, 259 (2d Cir. 2023) (quoting *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021).) Furthermore, "the weight to be given the various factors will necessarily vary with the circumstances of the particular cases." *Daniel*, 428 F.3d at 443.

28

The first efficient-enforcer factor, "whether the violation was a direct or remote cause of the injury," turns on "familiar principles of proximate causation." *Am. Express*, 19 F.4th at 139 (internal citations and quotation marks omitted). "In the context of antitrust standing, proximate cause generally follows the first-step rule." *Id.* That rule "requires some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 139–40 (internal quotation marks and citation omitted); *see also Gatt*, 711 F.3d at 78 ("Directness in the antitrust context means close in the chain of causation.") (quoting *IBM Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009)).

The Defendants argue that the Plaintiffs' alleged injury is not direct, as the Plaintiffs themselves allege that the target of the boycott was the CHL, and that the CHL is thriving. (Doc. 62-3, 16–17.) In response, Plaintiffs state that "Defendants sought ultimately to harm the CHL and its teams, but harming Plaintiffs was the 'means by which' Defendants sought to achieve that end." (Doc. 67 at 20); *see also McCready*, 457 U.S. at 479; *cf. Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 177 (3d Cir. 2015) ("If Defendants' attempt to prevent Wegmans from leasing the property fails, then Hanover Realty will have suffered the costs of responding to the legal challenges while Wegmans may have experienced no loss at all.")

Although the Defendants are correct that the target of the Boycott was the CHL, not the players, injury to the players was the direct method through which the Boycott was enacted. In the chain of causation, the alleged injury is a direct result of the Boycott.

The second factor asks if there is "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Am. Express*, 19 F.4th at 141 (quoting *IQ Dental Supply*, 924 F.3d at 65). "Although the existence of

29

more-motivated plaintiffs is not dispositive, the presence of plaintiffs who are better suited to vindicate the antitrust laws is relevant to this second factor," *IQ Dental Supply*, 924 F.3d at 66, because it "diminishes the justification for allowing a more remote party. . . to perform the office of a private attorney general." *Associated Gen. Contractors*, 459 U.S. at 542.

The Defendants argue that the CHL is a better situated plaintiff in this case, as they are the direct targets of the alleged Boycott. (Doc. 62-3 at 17.) Plaintiffs contend that they are motivated to vindicate the public interest in antitrust enforcement, and, as the "most immediate victims" of the Boycott, they are the entity most motivated by self-interest. (Doc. 67 at 20 (quoting *Singh v. Am. Racing-Tioga Downs Inc.*, No. 21-CV-0947, 2021 WL 6125432, at \*8 (N.D.N.Y. Dec. 28, 2021)). While the CHL may also be motivated to litigate, allowing only them to sue would risk "leav[ing] a significant antitrust violation undetected or unremedied," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (internal quotation marks and citation omitted)., as Plaintiffs' damages, the loss in wages, scholarships, and educational services they suffered are distinct from the damages suffered by the CHL.

The CHL is undoubtedly a well-situated plaintiff as the direct target of the Boycott; however, Plaintiffs themselves also have a serious motivation in their own litigation, as there is a separate injury and potential remedy at stake. This factor therefore favors Defendants, though not decisively. The CHL's own motivation to sue does not extinguish Plaintiffs' independent stake in the litigation, and only the Plaintiffs are in the position to vindicate their injury that they allege.

Under the third factor, courts "ask whether there would be 'a high degree of speculation in a damages calculation.' When an injury is 'derivative' rather than direct, the potential recovery is often 'highly speculative.'" *Am. Express*, 19 F.4th at 141 (quoting *IQ Dental Supply*,

30

924 F.3d at 66–67); *DirecTV, LLC*, 162 F.4th at 313. Courts also consider whether the "alleged effects on the [plaintiff] may have been produced by independent factors." *Associated Gen. Contractors*, 459 U.S. at 542; *Am. Express*, 19 F.4th at 141.

The Defendants state that the alleged injuries are "highly speculative" because many independent decisions would need to be made by intermediary actors in Plaintiffs' theory. (Doc. 62-3 at 17.) Plaintiffs contend that the assumptions needed to calculate damages—the lost scholarships or increased CHL wages—are reasonable, and that they would be simpler to calculate than the CHL's damages, comparatively.

This factor weighs most heavily in the Defendants' favor. Calculating what CHL wages or Division I scholarship offers would have looked like absent the Boycott necessarily requires projecting a counterfactual market shaped by decisions the CHL, Division I schools, and individual players never had occasion to make. That is a meaningfully more speculative undertaking than, for example, calculating lost wages in a labor market where the challenged restraint simply capped an existing, observable price. However, the other potential enforcer, the CHL, would also undertake significant projections in damage calculations, meaning that Plaintiffs' speculation would not be unreasonable relative to other enforcers.

The fourth factor emphasizes the importance of "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Am. Express*, 19 F.4th at 142 (quoting *Associated Gen. Contractors*, 459 U.S. at 543–44). The purpose of this factor is to "guard[] against 'pass-on theories that would require a court to divide damages from the same violation among multiple plaintiffs.'" *Platinum & Palladium*, 61 F.4th at 261 (quoting *Am. Express*, 19 F.4th at 143). "The concern arises when '[t]he damages to which [the plaintiff] lays claim' are 'exactly the same damages [other parties] could have

31

claimed.'" *Am. Express*, 19 F.4th at 142 (alterations in original) (quoting *IQ Dental Supply*, 924 F.3d at 67).

The Defendants do not provide an argument for the fourth factor, and the Plaintiffs state that there is no potential for duplicative recovery because Plaintiffs' damages are distinct from the CHL's damages. (Doc. 67 at 15.) The Court agrees with the Plaintiffs that there is no risk of duplicative recovery in this case.

Weighing the four factors together, the court concludes that Plaintiffs are adequate efficient enforcers of the antitrust laws. The first and fourth factors favor Plaintiffs outright: their injury flows directly from the Boycott, and there is no risk of duplicative recovery between Plaintiffs and the CHL. The second factor favors Defendants only modestly, since the existence of a better-positioned plaintiff does not eliminate Plaintiffs' own distinct stake in the case. The third factor favors Defendants more substantially, given the difficulty of reconstructing a counterfactual labor market. But *Daniel* instructs that the weight given each factor varies with the circumstances of the case, and here the directness of the Plaintiffs' injury outweighs the speculation inherent in calculating them. 428 F.3d at 443. Speculative damage calculations are, in any event, a common feature of antitrust cases and are ordinarily addressed through expert testimony and damage models rather than dismissal at the pleading stage. *See AngioDynamics Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 335 (N.D.N.Y. 2021); *Drug Mart Pharm. Corp. v. Am. Home Prods. Corp.*, 472 F. Supp. 2d 385, 424 (S.D.N.Y. 2007); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931). Furthermore, as the Boycott has ended, and leagues, teams, and players adjust to the new reality, projection may be easier to calculate, as the financial impacts of a Boycott-less reality are now observable. The court is satisfied that Plaintiffs have alleged that they are an efficient enforcer of antitrust laws.

32

## III.    Failure to State a Section 1 Claim under the Per Se Rule

To succeed on a Section 1 claim, "a plaintiff must prove that the common scheme designed by the conspirators constituted an unreasonable restraint of trade either per se or under the rule of reason." *Giordano v. Saks Incorporated*, 654 F. Supp. 3d 174, 195 (E.D.N.Y. 2023) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 320–21 (2d Cir. 2015) (further internal quotation marks omitted)). "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50 (1977).

The court elects not to make a ruling on the application of the per se rule at this time. The per se standard requires proof that a restraint always or almost always tends to restrict competition and decrease output. *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). It is too early in the case to make a decision on this issue, solely on the basis of the amended complaint. There will be sufficient time to consider this issue at summary judgment on a full record.

Because the amended complaint states a claim under the rule of reason, discussed below, the court need not resolve at this stage whether per se treatment would also apply.

## IV.    Failure to State a Rule of Reason Claim

"To determine whether a restraint violates the rule of reason. . . a three-step, burden-shifting framework applies." *Ohio v. Am. Express Co.*, 585 U.S. at 541. "Courts presumptively apply the rule of reason which requires consideration of all of the circumstances of a case in deciding whether the challenged practice violates Section 1." *Giordano*, F. Supp. 3d at 196 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Cont'l T.V*, 433 U.S. at 49–50). "First, a plaintiff bears the initial burden of demonstrating that a defendant's challenged behavior 'had an *actual* adverse effect on competition as a whole in the relevant market.'" *United States v. Am.*

33

*Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016) (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993)). Second, if the plaintiff satisfies that burden, it shifts to the defendant "to offer evidence of any procompetitive effects of the restraint at issue." *Id.* at 195 (citing *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)). If the defendant provides such proof, "the burden shifts back to the plaintiff[] to prove that any legitimate competitive benefits offered by defendant[] could have been achieved through less restrictive means." *Id.* (alterations in original) (quoting *Geneva Phrams.*, 386 F.3d at 507). In *Giordano*, the court explains that the plaintiff may satisfy the initial burden either through direct evidence of actual adverse effects or through circumstantial evidence showing the defendant possesses sufficient market power to cause such an effect. 654 F. Supp. 3d at 204–05.

In *Borozny v. Raytheon Techs. Corp.*, the District of Connecticut held that, at the pleading stage, "only the first step—whether a plaintiff has demonstrated that a defendant's challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market'—is material." No. 21-CV-1657, 2023 WL 348323, at *10 (D. Conn. Jan. 20, 2023) (quoting *Davitashvili v. Grubhub Inc.*, No. 20-cv-3000, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022)). At this stage, "the rule of reason inquiry requires only that the plaintiff 'identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market.'" *Id.* (quoting *Nostalgic Partners, LLC v. Off. of Comm'r of Baseball*, No. 21-cv-10876, 2022 WL 14963876, at *6 (S.D.N.Y. Oct. 26, 2022)).

Defendants argue that Plaintiffs have failed to allege that Defendants have market power in a plausible relevant market. Because market definition is critical to showing a substantial anticompetitive effect, they argue that the rule of reason claim must be dismissed.

34

Plaintiffs respond that market definition is unnecessary when a horizontal agreement such as a boycott has anticompetitive effects. If definition is required, however, the amended complaint defines the market as "elite young male hockey players, defined as those between the ages of sixteen and twenty-two who have sufficient skill to play in the most competitive non-NHL Leagues in North America." (Doc. 37 ¶ 69.) Plaintiffs assert that the courts have recognized the market for players of similar ability in other sports boycott cases and that people familiar with Division I hockey are able to recognize a distinct market for players with NHL potential. (Doc. 67 at 18–19.)

The court is satisfied that the amended complaint defines the market with sufficient clarity to provide a basis for asserting a claim of anticompetitive effect. Because the pool of scholarship-caliber players is relatively small and the stronger programs are well known, it is plausible that a coach or other knowledgeable observer could identify which players are legitimate professional prospects.

The issue of whether Plaintiffs have alleged an anticompetitive effect is less certain. Plaintiffs' allegations of real-world consequences flowing from the either/or choice the eligibility rules impose are relatively thin. High school age players who wish to preserve their Division I eligibility may choose to forego the CHL and play in lesser leagues before applying to college. (Doc. 67 at 28.) The Plaintiffs allege that this decrease in the pool of available players "reduces the number of teams that Division I and the CHL can field while still maintaining the level of quality that distinguishes those leagues from lower level leagues. . . ." (Doc. 67 at 29.) Plaintiffs also allege that dividing the market of players between the CHL and Division I led to decreased wages due to reduced competition for places on the teams' rosters.

35

The court acknowledges that Plaintiffs' allegations of anticompetitive effects are not fully developed. But *Borozny* requires only that Plaintiffs "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market," 2023 WL 348323, at *10, not that they prove the effect at the pleading stage. Plaintiffs have alleged a mechanism by which the eligibility rules produce that effect: by forcing players to choose between the CHL and Division I, the rules shrink the pool of players available to both leagues, which in turn reduces the number of competitively viable teams each league can field and reduces competition for roster spots. That chain of allegations, if true, plausibly supports an actual adverse effect on competition in the market for elite young hockey players, even though Plaintiffs will ultimately need to substantiate it with evidence at summary judgment. Whether Plaintiffs can support this theory on a fuller record is a question for another day.

For purposes of this motion, the court rules that Plaintiffs have plausibly alleged a horizontal agreement among the NCAA members to restrict competition within a defined market for elite young hockey players, sufficient to meet the Plaintiffs' burden as to the elements of their Sherman Act Section 1 claim.

### Conclusion

The Defendants' Motion to Dismiss is DENIED.

Dated this 6th day of August, 2026.

Geoffrey W. Crawford, Judge
United States District Court

36